**Robert D. SPRAGUE, et al., Plaintiffs–Appellees/Cross–Appellants,**

v.

**GENERAL MOTORS CORPORATION, Defendant–Appellant/Cross–Appellee.**

**Nos. 94–1896, 94–1897, 94–1898 and 94–1937.**

United States Court of Appeals, Sixth Circuit.

Argued April 23, 1997.

Decided Jan. 7, 1998.

Christopher G. Mackaronis (briefed), Raymond C. Fay (argued and briefed), Hillary L. Pettegrew, Bell, Boyd & Lloyd, Washington, DC, J. Douglas Peters, Charfoos & Christensen, Detroit, MI for Plaintiff–Appellee in Nos. 94–1896, 94–1897 and 94–1898.

Christopher G. Mackaronis (briefed), Raymond C. Fay (argued and briefed), Hillary L. Pettegrew, Bell, Boyd & Lloyd, Washington, DC, for Plaintiff–Appellee in No. 94–1937.

Stephen M. Shapiro (argued and briefed), Mayer, Brown & Platt, Chicago, IL, Kenneth S. Geller (briefed), Mayer, Brown & Platt, Washington, DC, Robert F. Walker (briefed), Elliot K. Gordon, Paul, Hastings, Janofsky & Walker, Santa Monica, CA, for General Motors Corp.

Susan M. Green, Karen L. Handorf (argued and briefed), U.S. Department of Labor, Office of the Solicitor, Washington, DC, Nancy E. Monarch, U.S. Department of Labor, Office of the Solicitor, Washington, DC, for Amicus Curiae Secretary of Labor.

Mary Ellen Signorille, American Association of Retired Persons, Washington, DC, for Amicus Curiae American Association of Retired Persons.

David M. Heilbron (briefed), Leslie Landau (briefed), Page B. Barnes (briefed), McCutchen, Doyle, Brown & Enersen, San Francisco, CA, for Amicus Curiae Chamber of Commerce of the United States, Michigan Manufacturers Association, ERISA Industry Committee.

Before: MARTIN, Chief Judge; LIVELY, MERRITT, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, DAUGHTREY, MOORE, and COLE, Circuit Judges.

NELSON, J., delivered the opinion of the court, in which RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, and DAUGHTREY, JJ., joined. LIVELY, (pp. 406–08) and MERRITT, JJ. (p. 408), delivered separate opinions concurring in part and dissenting in part. MARTIN, C.J. (pp. 408–16), delivered a separate dissenting opinion, in which MOORE and COLE, JJ., joined.

## OPINION

DAVID A. NELSON, Circuit Judge.

This is a purported class action in which the plaintiffs—retired employees of the defendant, General Motors Corporation—allege that GM violated the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), by denying them fully "paid-up" lifetime health care benefits. The district court certified a class of some

50,000 employees who had taken early retirement, but the court declined to grant class status to about 34,000 "general retirees" who had retired in accordance with the company's normal criteria. As to the general retiree plaintiffs, the court held that the benefits in question did not vest under the pertinent plan documents. As to the early retirees, however, the district court held that each of the 50,000 members of the class had entered into a separate contract that called for the benefits in question to be furnished for life at no cost to the recipient. In the alternative, the court ruled that GM was estopped to rely on the terms of the plan documents to defeat the claims of any early retiree.

We shall affirm the judgment of the district court as to the general retirees, but reverse the court's certification of the class of early retirees. Insofar as the merits of the claims asserted by the named plaintiffs are concerned, we conclude that the claims fail as a matter of law.

## I

### A

In 1961 General Motors began paying part of the cost of health insurance for its salaried retirees[1] and their surviving spouses. Three years later GM assumed the full cost of basic health insurance for its salaried retirees, and in 1968 it extended this benefit to surviving spouses as well. (In the interest of simplicity, further reference to surviving spouses will generally be omitted.)

In addition to basic health insurance, GM offered its salaried retirees supplemental coverage under what was called the Comprehensive Medical Expense Insurance Program. Participants in this optional program were required to pay a share of the premiums, and co-payment was required for certain medical services. There were also annual deductibles.

Prior to 1985 the health care benefits were provided through arrangements with private insurers. The insurers issued each covered person a certificate of insurance describing the terms and conditions of the underlying policy.

GM became fully self-insured in 1985. At that time the company prepared a document, entitled "The General Motors Health Care Insurance Program for Salaried Employees," that set forth the terms and conditions of GM's self-insured health care program. The district court found that this document, together with subsequent documents announcing changes in coverage, comprised GM's health care benefits plan from and after 1985.[2] The new plan gave participants a choice between traditional fee-for-service coverage and enrollment in a managed care organization. GM continued its supplemental coverage program, shortening the name to the Comprehensive Medical Expense Program.

GM has long made it a practice to inform its salaried employees and retirees of their health care coverage by providing them booklets containing summaries of the company's health insurance policies and programs. Prior to 1974 GM put out a booklet entitled "The GM Insurance Program for Salaried Employees." After ERISA took effect in 1974 the booklet became "Highlights of Your GM Benefits." Beginning in 1977 GM also issued a booklet called "Your Benefits in Retirement." Each of these publications went through a series of different editions.

A number of the booklets contained language informing plan participants that the health care plan called for GM to pay health insurance costs during retirement:

- "If you retire ... and are eligible to receive retirement benefits under the provisions of the GM Retirement Program for Salaried Employees, you may keep your basic hospital, surgical and

---

1. As used here, the term "salaried retirees" signifies non-union GM employees who had been receiving salaries, rather than hourly wages, at the time they retired. All of the plaintiffs are either salaried retirees or the surviving spouses of salaried retirees.

2. Although the content of the plan was not static, this fact has no relevance here; the district court found, and we agree, that all versions clearly reserved to GM the right of amendment or termination. We shall therefore refer to a single GM "plan," recognizing that this is something of a simplification.

medical expense coverages in effect.... GM will pay the full monthly premium or subscription charge for such coverages." The General Motors Insurance Program for Salaried Employees (1968). The 1971 version was nearly identical.

- "Hospital–Medical Coverages: Your basic coverages will be provided at Corporation expense for your lifetime...." Highlights of Your GM Benefits (1974).
- "Your basic health care coverages will be provided at GM's expense for your lifetime...." Your Benefits in Retirement (1977).
- "General Motors pays the full cost of any basic health care coverages that are continued for most retired employees and for eligible surviving spouses and children of deceased retirees." Your Benefits in Retirement (1977).

However, most of the booklets also put plan participants on notice of GM's right to change or terminate the health care plan at any time:

- "General Motors believes wholeheartedly in this Insurance Program for GM men and women, and expects to continue the Program indefinitely. However, GM reserves the right to modify, revoke, suspend, terminate, or change the Program, in whole or in part, at any time...." The General Motors Insurance Program for Salaried Employees (1965, 1968, and 1971).
- "General Motors Corporation reserves the right to amend, change or terminate the Plans and Programs described in this booklet." Your GM Benefits (1985).
- "The Corporation reserves the right to amend, modify, suspend, or terminate its benefit Plans or Programs by action of its Board of Directors." Your Benefits in Retirement (1985).

## B

For more than two decades GM has engaged in systematic reductions in the size of its salaried workforce. In this connection the company has launched special early retirement programs designed to induce salaried workers to retire before reaching normal retirement age. The inducements have included, among other things, offers to provide pension benefits to early retirees at levels not reduced to reflect the longer periods over which such benefits can be expected to accrue. Some of the early retirement programs were company-wide initiatives, while others applied to a particular plant, division, or group of plants or divisions.

Salaried employees who accepted early retirement were often asked to sign documents evincing their acceptance of the terms of the particular program under which they were retiring. From 1974 until 1984 GM utilized a so-called "short form" statement of acceptance. This document typically included language along the following lines:

"Management has discussed with me the possibility of retiring under the Special Early Retirement provisions of the General Motors Retirement Program for Salaried Employees. I have evaluated the benefits applicable to me under the provisions of the Program and am agreeable to accepting Special Early Retirement...."

In 1984 GM adopted the "long form" statement of acceptance. It typically read, in part, something like this:

"Management has discussed with me the option of continuing my employment with General Motors or accepting an immediate special retirement under the Special Retirement provisions of the General Motors Retirement Program for Salaried Employees. I have evaluated the benefits applicable to me under the provisions of the General Motors Corporate Wide Special Separation Program and have decided to accept them.

. . . .

I am satisfied with the terms of the special retirement offer and accept this offer voluntarily with full knowledge of its significance, including the fact that by accepting it I waive any claim in any way connected with my separation from employment with General Motors. I acknowledge that no prior representations, promises or agreements relating to my employment and retirement have been made by General Motors which are contrary to this agreement and that the special retirement offer and

my acceptance of the special retirement offer constitute the entire and only agreement between me and General Motors. I understand that I shall not be eligible for recall to work and shall have no further right to employment with General Motors Corporation or any of its subsidiaries."

Both forms had numerous variants, but all stated in essence that the early retiree had "reviewed the benefits applicable" and "accept[ed] them." In return for such benefits, the early retirees agreed to waive certain causes of action they might have had against GM.

Not all early retirees signed a statement of acceptance. Some merely signed a "statement of intent" to retire, while others apparently signed nothing.

In the course of explaining its special early retirement programs, GM made numerous oral and written representations about the health care benefits available to early retirees. Most of the early retirees participated in exit interviews where a particular early retirement program was described. These interviews were conducted by plant supervisors, members of the benefits staff, and others. Many of the early retirees also received documents summarizing applicable retirement benefits. These summaries often informed retirees that their health insurance would be paid by GM for life. Again, however, such documents sometimes put the retirees on notice of GM's right to change benefits. Certain summaries advised, for example, that "General Motors Corp. reserves the right to amend, change or terminate the Programs described."

Some early retirees received individualized letters about early retirement programs. And a small number of early retirees explicitly asked GM representatives about future changes to health care benefits. The answers given, it seems, were accurate—benefits could be changed in the future.

### C

Late in 1987 GM announced that early in the following year significant changes would become effective in health care coverage for both salaried employees and retirees. In the case of plan participants who elected traditional fee-for-service coverage, the changes included an annual deductible of $200 for individuals and $250 for families. Fee-for-service participants were required to make 20% co-payments on medical services, up to an annual maximum co-payment of $500. By reason of these two changes, fee-for-service plan participants could find themselves responsible for paying as much as $700 a year (with individual coverage) or $750 (with family coverage) that would previously have been paid by GM.

These were not the only changes made to the health care plan for salaried employees and retirees. Vision and hearing aid coverages were eliminated, for example, while there were cost-sharing increases for participants in the Comprehensive Medical Insurance Program. At the same time, however, some benefits and coverages were improved.

### D

The present lawsuit was commenced in August of 1989 by 114 salaried retirees who challenged the legality of the changes to the health care plan that took effect in 1988. The main thrust of the plaintiffs' complaint was that GM had bound itself to provide salaried retirees and their spouses basic health coverage for life, entirely at GM's expense. The right to such coverage vested upon retirement, according to the plaintiffs, so the coverage could never be changed or revoked.

Seven separate causes of action were pleaded: (1) failure to maintain the written plan documentation required by ERISA; (2) violation of the health care plan; (3) breach of fiduciary duty; (4) breach of contract; (5) equitable or promissory estoppel; (6) failure to supply requested information; and (7) failure to comply with the requirements for summary plan descriptions. The named plaintiffs purported to represent a class of some 84,000 similarly-situated individuals, about 50,000 of whom were early retirees and 34,000 of whom were general retirees.[3]

**3.** The term "early retirees" refers to salaried, non-union employees who agreed to retire be-

The district court entered partial summary judgment in favor of GM after making the following rulings:

- the plaintiffs' benefits did not vest under the terms of the welfare plan, *Sprague v. General Motors Corp.,* 768 F.Supp. 605, 610–11 (E.D.Mich.1991) (*"Sprague I "*);

- the summary plan descriptions generally put the plaintiffs on notice of GM's right to amend or terminate the plan, *id.;* and

- the plaintiffs had no claim for breach of fiduciary duty, GM not having acted in a fiduciary capacity when amending the plan, *id.* at 612.

After *Sprague I,* the district court allowed the early retirees to proceed on a bilateral contract theory and allowed everyone to proceed on an estoppel theory. The procedural course of the litigation was further shaped by the following pretrial rulings:

- the plaintiffs were not entitled to a jury trial, *Sprague v. General Motors Corp.,* 804 F.Supp. 931 (E.D.Mich.1992);

- the general retirees could not proceed as a class; and

- the early retirees could proceed as a class pursuant to Rule 23(b)(2), Fed. R.Civ.P.

Following a lengthy bench trial, the district court made these rulings on the merits:

- GM was found to have made a bilateral contract with each early retiree to vest health care benefits at retirement, *Sprague v. General Motors Corp.,* 843 F.Supp. 266, 299 (E.D.Mich.1994) (*"Sprague II "*);

- these bilateral contracts were held to be enforceable as ERISA plans or as modifications to the general plan, *id.*[4];

- GM was held not to be estopped from changing the health care benefits of the general retirees, to whom it made no promises to vest benefits, *Sprague v. General Motors Corp.,* 857 F.Supp. 1182, 1188–89 (E.D.Mich.1994) (*"Sprague III "*);

- GM was held to be estopped from changing the health care benefits of the early retirees based on the oral and written representations it made to them, *id.* at 1190–92; and

- GM was enjoined during this appeal from making further adverse changes to the health care benefits of the prevailing plaintiffs, *id.* at 1192–93.

In August of 1994 the district court entered a final judgment embodying all of its previous rulings. The plaintiffs and GM perfected timely appeals, and each of the aforementioned rulings was challenged by one side or the other. The appeals were consolidated, and a three-judge panel of this court affirmed the rulings in favor of the early retirees and remanded the case for reconsideration of the issues (except the plaintiffs' jury demand) on which the district court had held for GM. See *Sprague v. General Motors Corp.,* 92 F.3d 1425 (6th Cir.1996). A majority of the active judges of this court subsequently voted to rehear the case *en banc,* and the panel decision was thereby vacated. 102 F.3d 204 (6th Cir.1996). Supplemental briefs having been filed, and the case having been argued before the full court, we are ready to issue our final decision.

II

In certifying a class of 50,000 early retirees, the district court concluded that the class satisfied the four prerequisites of Rule 23(a), Fed.R.Civ.P. (numerosity, commonality, typicality, and adequacy of representation)[5] and that the action could be maintained

---

tween 1974 and 1988 under one of GM's special early retirement programs. The term "general retirees" refers to salaried, non-union employees who "voluntarily retired, either at age 65 or before, and were able to do so without GM's consent, pursuant to the terms of the General Motors Retirement Program for Salaried Employees." *Sprague v. General Motors Corp.,* 843 F.Supp. 266, 269 (E.D.Mich.1994).

**4.** After *Sprague II,* the plaintiffs voluntarily dismissed their claims for failure to supply requested information and failure to comply with the requirements for summary plan descriptions. Pursuant to stipulation, the claim arising from the alleged failure to maintain a written plan instrument was dismissed with prejudice.

**5.** Rule 23(a) reads as follows:
   "Prerequisites to a Class Action. One or more members of a class may sue or be sued as

under Rule 23(b)(2).[6] The class was then divided into four subclasses, as permitted by Rule 23(c)(4). The subclasses consisted of (1) early retirees who signed "long form" statements of acceptance of early retirement, (2) those who had signed "short form" statements of acceptance, (3) those who had signed only "statements of intent" to retire early, and (4) those for whom no relevant documents could be found. (As we have said, the court refused to certify the general retirees as a class.) GM appeals the certification of the class of early retirees, while the plaintiffs appeal the district court's refusal to certify a class of general retirees.

■ Although we will reverse a class certification decision only if the district court abused its discretion, *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 895 (6th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 173, 136 L.Ed.2d 114 (1996), a district court may not certify any class without "rigorous analysis" of the requirements of Rule 23. *General Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982). No class that fails to satisfy all four of the prerequisites of Rule 23(a) may be certified, and each class meeting those prerequisites must also pass at least one of the tests set forth in Rule 23(b). *In re American Med. Sys., Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996).

We conclude that the district court's refusal to certify a class or sub-class of general retirees was unexceptionable as far as the plaintiffs are concerned. Ironically, perhaps, the general retirees may have been better-suited for class treatment than the early retirees. The general retirees, not having received individualized inducements to retire, base their claims on the plan itself and the summary plan description booklets—documents common to all salaried retirees. But

by the time it made a certification decision, the district court had rejected the primary claim of the named general retiree plaintiffs. For reasons we shall explain presently, we believe that the court acted correctly in doing so. The plaintiffs have no basis for complaining of a refusal to certify a proposed class where the representatives of the class cannot prevail on the merits, and the defendant, GM, is not contesting the decision not to certify a class of general retirees.

### A

We turn now to the class that was certified—the early retirees. With regard to Rule 23(a), we shall confine our analysis to the commonality and typicality requirements.

■ The commonality requirement deals with shared questions of law or fact. Although Rule 23(a)(2) speaks of "questions" in the plural, we have said that there need only be one question common to the class. *American Med. Sys.,* 75 F.3d at 1080. It is not every common question that will suffice, however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality. What we are looking for is a common issue the resolution of which will advance the litigation.

■ When this case began, the claims of all members of the purported class, both general retirees and early retirees, did share certain common issues. All salaried retirees' health care benefits were governed by the same welfare plan, and the proper interpretation of the plan was at issue. Similarly, GM issued a common set of summary plan descriptions the significance of which was at issue as well. By the time the district court took up the certification question, however, these common questions had already been

representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Rule 23(a), Fed.R.Civ.P.

**6.** "Class Actions Maintainable. An action may be maintained as a class action if the prerequi-

sites of subdivision (a) are satisfied, and in addition:

. . .

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief, or corresponding declaratory relief with respect to the class as a whole. . . ." Rule 23(b)(2), Fed.R.Civ.P.

decided. The district court did not certify the class until after its decision in *Sprague I,* where the court ruled (a) that the plan unambiguously reserved GM's right to amend or terminate the plan, and (b) that the summaries did not change the reservation of this right.

The issues that remained after *Sprague I* were anything but common. *Sprague I,* as we have said, permitted the early retirees to proceed on a bilateral contract theory and an estoppel theory.[7] Neither theory was susceptible to class-wide treatment. The premise of the bilateral contract theory was that GM had made an individual "side deal" with each early retiree. Each putative side deal involved any pertinent document the retiree might have signed—and the statements of acceptance, as we have seen, said nothing more about health insurance than that the early retiree accepted the "applicable" benefits—as well as any pertinent representations GM might have made to the retiree, whether orally, in writing, or both. A retiree might have signed a "long form" statement of acceptance, or a "short form," or a "statement of intent" to retire, or nothing at all. He might have heard GM officials speak about the special early retirement program at a group meeting, or might have seen a program summary compiled by GM, or might have had a one-on-one meeting with his supervisor or with a GM benefits person. He might have retired from a particular plant in a particular division and been given a particular set of representations, or he might have retired from a different plant in a different division and been given a completely different set of representations. Proof that GM had contracted to confer vested benefits on one early retiree would not necessarily prove that GM had made such a contract with a different early retiree.

▮▮▮ The plaintiffs' estoppel theory was even less susceptible to class-wide treatment.

An estoppel claim requires proof of what statements were made to a particular person, how the person interpreted those statements, and whether the person justifiably relied on the statements to his detriment. See Part IV, *infra; Armistead v. Vernitron Corp.,* 944 F.2d 1287, 1298 (6th Cir.1991). Because of their focus on individualized proof, estoppel claims are typically inappropriate for class treatment. See *Jensen v. SIPCO, Inc.,* 38 F.3d 945, 953 (8th Cir.1994) (estoppel "must be applied with factual precision and therefore is not a suitable basis for class-wide relief"), *cert. denied,* 514 U.S. 1050, 115 S.Ct. 1428, 131 L.Ed.2d 310 (1995).

GM's statements to the early retirees were not uniform. Among other things, the statements varied (1) based on the person making the representation, (2) based on the particular special early retirement program that applied, (3) from facility to facility, and (4) from time to time. Given the wide variety of representations made, there must have been variations in the early retirees' subjective understandings of the representations and in their reliance on them. Some retirees might have interpreted GM's statements to mean that their benefits were vested. Others might have understood that their benefits were subject to change. Some early retirees might have relied on GM's statements about health care benefits, while for others the statements might have made no difference at all in the decision to retire early.

Given these myriad variations, it seems to us that the plaintiffs' claims clearly lacked commonality. See *American Med. Sys.,* 75 F.3d at 1081 (granting mandamus to reverse a class certification where each claim turned on issues of reliance, causation, and damages that were peculiar to each class member). Because each plaintiff's claim depended upon facts and circumstances peculiar to that plaintiff, class-wide relief was not appropriate.[8]

---

7. After *Sprague I,* the plaintiffs' claims for failure to maintain a written plan, failure to provide requested information, and failure to comply with summary plan description requirements remained temporarily intact. Although these counts might have raised potentially common questions, they were eventually dismissed. See note 4, *supra.*

8. The majority opinion in *Bittinger v. Tecumseh Products Co.,* 123 F.3d 877 (6th Cir.1997) (a case decided after the instant opinion was circulated to the en banc court) does not purport to limit the holding of *American Med. Sys.* Unlike *American Med. Sys.,* the *Bittinger* case did involve a question of law or fact common to the class: relying on the same collective bargaining agree-

## B

■ The class of early retirees fails the typicality test of Rule 23(a) as well. This test "limit[s] the class claims to those fairly encompassed by the named plaintiffs' claims." *American Med. Sys.*, 75 F.3d at 1082 (citation and quotation omitted).

"Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.... A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Id.* (citing 1 Herbert B. Newberg and Alba Conte, 1 *Newberg on Class Actions*, § 3–13, at 3–75, 76 (3d ed.1992) (internal quotations omitted)).

■ In pursuing their own claims, the named plaintiffs could not advance the interests of the entire early retiree class. Each claim, after all, depended on each individual's particular interactions with GM—and these, as we have said, varied from person to person. A named plaintiff who proved his own claim would not necessarily have proved anybody else's claim. See *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 597 (7th Cir.1993) (typicality requirement was not satisfied where different groups of class members received different representations), *cert. denied,* —— U.S. ——, 117 S.Ct. 305, 136 L.Ed.2d 222 (1996). The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class. That premise is not valid here.

The course of this litigation in the district court amply demonstrates, we think, that typicality was lacking. The district court took testimony from more than three hun-dred class members in an effort to obtain a purportedly representative sample of the representations and communications made by GM. That it was necessary to do so strongly suggests to us that class-wide relief was improper.

■ We conclude that the district court abused its discretion in certifying the class of early retirees. Some class members may have signed the same form, some may have received the same documents, or some may have attended the same meetings about the early retirement program, but taken as a whole the class claims were based on widely divergent facts. Class-wide relief was awarded here without any necessary connection to the merits of each individual claim. Rule 23 does not permit that result.[9]

The claims of the 114 named plaintiffs are still before the court, however, regardless of whether these individuals represent the purported class. We see no reason not to address the merits of the named plaintiffs' claims.

### III

#### A

The plaintiffs' first theory of recovery is that GM committed a breach of the terms of the plan documents when it implemented the changes in 1988. Under the plan documents, according to the plaintiffs, their health care benefits were vested—and having vested, the benefits could not be altered without the plaintiffs' consent.

The district court rejected this theory, holding that the plan documents, including the summary plan descriptions, effectively reserved a right on GM's part to amend or terminate the plan. The court's holding, in our view, was manifestly correct; we shall affirm the summary judgment that was entered in favor of GM on this issue.

ment, each class member in *Bittinger* claimed that the agreement contained a guaranty of lifetime, fully-funded benefits. *Bittinger,* 123 F.3d at 884. No such common question was before the district court when class certification was granted in the case at bar. Even if all of the other requirements of Rule 23 had been met here, the absence of commonality would have necessitated a denial of class certification.

9. The district court's use of subclasses did not solve the problem. Subclasses are not a substitute for compliance with Rule 23.

ERISA distinguishes between pension plans and welfare plans. A pension plan "provides retirement income to employees" or "results in a deferral of income by employees for periods extending to the termination of ... employment or beyond...." 29 U.S.C. § 1002(2). Welfare plans, in contrast, include plans "established or ... maintained for the purpose of providing ... medical, surgical, or hospital care or benefits...." *Id.* § 1002(1). Because the plan in question here provided health insurance to its participants, it was a welfare plan. See *Musto v. American Gen. Corp.*, 861 F.2d 897, 901 n. 2 (6th Cir.1988) (a medical insurance plan is a welfare plan), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989).

Welfare plans are specifically exempted from vesting requirements to which pension plans are subject. 29 U.S.C. § 1051(1). Therefore, employers "are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 1228, 131 L.Ed.2d 94 (1995) (citing *Adams v. Avondale Indus., Inc.,* 905 F.2d 943, 947 (6th Cir.), *cert. denied,* 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990)). Employers may vest welfare benefits if they choose to do so, however. See *Inter–Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.,* —— U.S. ——, ——, 117 S.Ct. 1513, 1516, 137 L.Ed.2d 763 (1997) (an employer may "contractually cede[ ] its freedom" not to vest benefits). See also *In re White Farm Equip. Co.,* 788 F.2d 1186, 1193 (6th Cir.1986), where we held that "the parties may themselves set out by agreement or by private design, as set out in plan documents, whether retiree welfare benefits vest, or whether they may be terminated." To the same effect see *Boyer v. Douglas Components Corp.,* 986 F.2d 999, 1005 (6th Cir.1993).

To vest benefits is to render them forever unalterable. Because vesting of welfare plan benefits is not required by law, an employer's commitment to vest such benefits is not to be inferred lightly; the

intent to vest "must be found in the plan documents and must be stated in clear and express language." *Wise v. El Paso Natural Gas Co.,* 986 F.2d 929, 937 (5th Cir.), *cert. denied,* 510 U.S. 870, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993); see also *In re Unisys Corp. Retiree Med. Benefit ERISA Litig.,* 58 F.3d 896, 902 (3d Cir.1995) (same); *Gable v. Sweetheart Cup Co., Inc.,* 35 F.3d 851, 855 (4th Cir.1994) (same), *cert. denied,* 514 U.S. 1057, 115 S.Ct. 1442, 131 L.Ed.2d 321 (1995). It is the plaintiffs' burden to prove GM's intent to vest. *Id.*

The plaintiffs have not seriously disputed that the plan itself permitted GM to amend or terminate benefits.[10] Instead the plaintiffs focus on the plan summaries, which must "be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a)(1).

In *Edwards v. State Farm Mut. Auto. Ins. Co.,* 851 F.2d 134, 136 (6th Cir.1988), we held that "statements in a summary plan are binding and if such statements conflict with those in the plan itself, the summary shall govern." Application of the *Edwards* principle, the plaintiffs say, compels a judgment in their favor. We disagree.

The principle announced in *Edwards* was based on ERISA's directive that plan administrators furnish summary plan descriptions to participants and beneficiaries. This requirement did not become generally effective until 1977. See *Musto,* 861 F.2d at 904. We could not hold GM liable for violations of a statutory requirement based on actions taken prior to the effective date of that requirement. If the plaintiffs have any cause of action based on GM's pre–1977 summaries, it is probably not one based on ERISA. It appears likely that only the booklets issued in 1977 and thereafter are relevant to the inquiry.[11] We shall assume

---

**10.** The 1985 plan expressly stated that "[a]ny rate of payment by the enrollee and any other terms and conditions of the Program may be changed at any time by the Corporation."

**11.** The plaintiffs argue that the summary plan

that all of the booklets issued in 1977 or later were intended to serve as summary plan descriptions.

■ Most of the summary plan descriptions unambiguously reserved GM's right to amend or terminate the plan. For example:

- "General Motors Corporation reserves the right to amend, change or terminate the Plans and Programs described in this booklet." Your GM Benefits (1984).
- "The Corporation reserves the right to amend, modify, suspend, or terminate its benefit Plans or Programs by action of its Board of Directors." Your Benefits in Retirement (1985).

The plaintiffs counter by pointing out that these summaries also told them that their health coverage would be paid "at no cost to" them and "for [their] lifetime[s]." Such language, they argue, created an ambiguity within the summaries that must be resolved by extrinsic evidence.

We have rejected this argument in the past, and we reject it again now. We see no ambiguity in a summary plan description that tells participants both that the terms of the current plan entitle them to health insurance at no cost throughout retirement and that the terms of the current plan are subject to change.

> "To read this summary as saying that the plan can never be changed in such a way as to mandate retiree contributions for continued medical coverage is to read into the summary something its authors did not put there (a promise to provide lifetime 'paid up' medical insurance), while reading out of the summary something that clearly was put there (an express reservation of right to change the plan)." *Musto*, 861 F.2d at 906.

As the Third Circuit explained in a similar case, "the promise made to retirees was a qualified one: the promise was that retiree medical benefits were for life provided the company chose not to terminate the plans,

pursuant to clauses that preserved the company's right to terminate the plan under which those benefits are provided." *Unisys Corp.*, 58 F.3d at 904 n. 12; see also *Wise*, 986 F.2d at 934.

Not all of the summaries clearly stated that GM could amend or terminate the plan. But the failure to allude to this power in some of the booklets did not prejudice GM's right, clearly stated in the plan itself, to change the plan's terms.

■ In the first place, the principle announced in *Edwards* does not apply to silence. *Cf. Foltice v. Guardsman Prods.*, 98 F.3d 933, 938 (6th Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 1312, 137 L.Ed.2d 475 (1997); *Edwards*, 851 F.2d at 136 ("if such statements *conflict* with those in the plan itself, the summary shall govern") (emphasis added). An omission from the summary plan description does not, by negative implication, alter the terms of the plan itself. *Jensen*, 38 F.3d at 952; *Wise*, 986 F.2d at 938. The reason is obvious: by definition, a summary will not include every detail of the thing it summarizes. GM's failure to include in some summaries a notice of its right to change the plan does not trump the clearly-stated right to do so in the plan itself.

■ In the second place, GM was not required to disclose in the summary plan descriptions that the plaintiffs' benefits were not vested. See *Jensen*, 38 F.3d at 952 ("a welfare plan SPD [summary plan description] is not required to disclose that plan benefits are not vested"); *Gable*, 35 F.3d at 858 ("ERISA does not require SPDs to specifically address the possibility that those terms might later be changed, as ERISA undeniably permits") (quotation and citation omitted); *Wise*, 986 F.2d at 936 ("ERISA does not mandate the inclusion within SPDs of amendment rights or procedures").

ERISA specifies in detail the information that every summary plan description "shall

---

description requirement was phased in beginning in 1974, and that only employers who sought some sort of temporary exemption were excused from immediate compliance. GM, they contend, never proved that it had such an exemption. The plaintiffs may be correct that we should look at

the summaries issued in 1974 and thereafter, not just those issued in 1977 and thereafter. Either way, the result would be the same: for the reasons developed in the text, the plan summaries did not deprive GM of the right to amend or terminate the plan.

contain." See 29 U.S.C. § 1022(b). Among the items a summary must include is "a description of the provisions providing for nonforfeitable pension benefits." *Id.* Despite having required that summaries inform plan participants about the vesting of benefits under *pension* plans, Congress did not require such information for *welfare* plans; neither did the Department of Labor in its ERISA reporting and disclosure regulations. See 29 C.F.R. § 2520.102–3(n) (summary plan descriptions shall contain, "[i]n the case of an employee *pension* benefit plan, a description and explanation of the plan provisions for . . . vesting") (emphasis added). The absence of a similar requirement for welfare plans was no mistake. See *Jensen,* 38 F.3d at 952 (the "failure to require SPDs to disclose nonvesting cannot be an inadvertent omission"). ERISA, after all, is a "comprehensive and reticulated statute," *Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 361, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980), and the reporting and disclosure requirements are themselves "comprehensive." *Curtiss–Wright,* 514 U.S. at 83, 115 S.Ct. at 1230. We decline to apply the judge-made rule of *Edwards* in such a way as to augment the detailed disclosure provisions of the statute.

Neither the GM plan itself nor any of the various summaries of the plan states or even implies that the plaintiffs' benefits were vested. Accordingly, we conclude that the district court acted correctly in granting summary judgment to GM on the plaintiffs' claim that the company violated the terms of its plan.

## B

We turn next to the theory that GM bilaterally contracted with each early retiree to vest benefits. All of the early retirees took retirement under one of the special early retirement programs offered by GM between 1974 and 1988. The early retirees argue that, as the district court held, the statements, promises, and representations GM made to them in connection with these programs, and the documents that they signed, created binding bilateral contracts. The alleged contracts, which supposedly provided for vesting of the early retirees' health care benefits, are said to be enforceable either as modifications to the general plan, or as ERISA plans themselves, or as a matter of federal common law.

ERISA "has an elaborate scheme in place for beneficiaries to learn their rights and obligations at any time, a scheme that is built around reliance on the face of written plan documents." *Curtiss–Wright,* 514 U.S. at 83, 115 S.Ct. at 1230. To implement this scheme, ERISA requires that every plan "shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). ERISA also requires, as we have said, a written summary plan description that will "reasonably apprise . . . participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a).

The writing requirement ensures that "every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." *Curtiss–Wright,* 514 U.S. at 83, 115 S.Ct. at 1230 (quoting H. Rep. No. 1280, 93d Cong., 2d Sess. 297, reprinted in 1974 U.S.Code Cong. & Admin. News 5038, 5077–78). And the requirement lends predictability and certainty to employee benefit plans. *Gable,* 35 F.3d at 857. This serves the interests of both employers and employees. See *Gordon v. Barnes Pumps, Inc.,* 999 F.2d 133, 136 (6th Cir.1993); *Adams,* 905 F.2d at 947; *Gable,* 35 F.3d at 857; *Moore v. Metropolitan Life Ins. Co.,* 856 F.2d 488, 492 (2d Cir.1988).

■ "Congress intended that plan documents and SPDs exclusively govern an employer's obligations under ERISA plans." *Moore,* 856 F.2d at 492. We recognize that "[t]his may not be a foolproof informational scheme, although it is quite thorough. Either way, it is the scheme that Congress devised." *Curtiss–Wright,* 514 U.S. at 84, 115 S.Ct. at 1231.

■ Our court has consistently refused to recognize oral modifications to written plan documents. "[W]e are quite certain," we have explained, "that Congress, in passing ERISA, did not intend that participants in employee benefit plans should be left to the

uncertainties of oral communications in finding out precisely what rights they were given under their plan." *Musto*, 861 F.2d at 909–10. Therefore, the "clear terms of a written employee benefit plan may not be modified or superseded by oral undertakings on the part of the employer." *Id.* at 910; see also *Gordon*, 999 F.2d at 137 (same); *Boyer*, 986 F.2d at 1005 (same). The plaintiffs may not invoke oral statements by GM personnel in order to modify the terms of the written plan.

■ Neither can we accept the argument that the plan was modified or superseded either by the written "statements of acceptance" signed by some of the named plaintiffs or by the written representations received by some from GM. "That [the defendant's] statements were made in writing is irrelevant as they do not profess to be plan amendments." *Borst v. Chevron Corp.*, 36 F.3d 1308, 1323 (5th Cir.1994), *cert. denied*, 514 U.S. 1066, 115 S.Ct. 1699, 131 L.Ed.2d 561 (1995). None of GM's representations suggested that the plan was being modified. The statements of acceptance, moreover, merely said that the employee "ha[d] reviewed the benefits applicable to [him]" and "accept[ed] them." Far from modifying the terms of the welfare plan, it seems to us, this language incorporated the plan's terms.[12]

■ The statements of acceptance were not ERISA plans themselves. Every ERISA plan must specify a funding mechanism, must allocate operational and administrative responsibilities, and must state how payments are made to and from the plan. 29 U.S.C. § 1102(b)(1)-(2), (4). See *Gable*, 35 F.3d at 857 n. 2 (documents that do not satisfy ERISA's requirements for plan documents do not qualify as ERISA plan documents). While it is at least conceivable that an enforceable ERISA plan might not meet all of these requirements, the alleged bilateral contracts at issue here met none of them. The "statements of acceptance" simply did

not purport to be ERISA plans, and we decline to treat them as such.

For us to sanction informal "plans" or plan "amendments"—whether oral or written—would leave the law of employee benefits in a state of uncertainty and would create disincentives for employers to offer benefits in the first place. Such a result is not in the interests of employees generally, and it is certainly not compatible with the goals of ERISA. *Cf. Moore*, 856 F.2d at 489: "Altering a welfare plan on the basis of non-plan documents and communications, absent a particularized showing of conduct tantamount to fraud, would undermine ERISA."

### IV

The plaintiffs argue that GM is estopped from enforcing the terms of the written plan against them. After the bench trial, the district court found that GM made no misleading representations to the general retirees. *Sprague III*, 857 F.Supp. at 1188–89. That finding appears unassailable. As to the early retirees, however, the district court ruled that GM was estopped from enforcing the plan because it misrepresented the plan's terms. *Id.* at 1189–92. In this, we believe, the court erred as a matter of law.

■ We have held that equitable estoppel may be a viable theory in ERISA cases, at least in regard to welfare plans. *Armistead*, 944 F.2d at 1298. The elements of an equitable estoppel claim, as announced by the *Armistead* panel, are as follows: (1) there must be conduct or language amounting to a representation of material fact; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend that the representation be acted on, or the party asserting the estoppel must reasonably believe that the party to be estopped so intends; (4) the party asserting the estoppel must be unaware of the true facts; and (5) the party asserting the estoppel must reasonably or justifiably rely on the representation to his detriment. *Id.* at 1298.[13]

---

12. For present purposes, we accept the early retirees' assertion that the phrase "benefits applicable to [the early retirees]" referred to pension *and* welfare benefits. If, as GM plausibly argues and as the context suggests, the phrase referred

only to pension benefits, then the "statements of acceptance" have nothing whatever to say about the health care plan.

13. Although we have never explicitly held that promissory estoppel claims are cognizable under

■ Principles of estoppel, however, cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provisions. See *Fink v. Union Central Life Ins. Co.*, 94 F.3d 489, 492 (8th Cir.1996); *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 458 n. 12 (11th Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 1082, 137 L.Ed.2d 217 (1997). There are at least two reasons for this. First, as we have seen, estoppel requires reasonable or justifiable reliance by the party asserting the estoppel. That party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party. Second, to allow estoppel to override the clear terms of plan documents would be to enforce something other than the plan documents themselves. That would not be consistent with ERISA.

■ In the case at bar, we conclude that the plaintiffs' estoppel claims fail as a matter of law. As we have said, GM's plan and most of the summary plan descriptions issued to the plaintiffs over the years unambiguously reserved to GM the right to amend or terminate the plan. In the face of GM's clearly-stated right to amend—a right contained in the plan to which the plaintiffs had access and in many of the summaries they were given—reliance on statements allegedly suggesting the contrary was not, and could not be, reasonable or justifiable, especially when GM never told the plaintiffs that their benefits were vested or fully paid-up. See *Musto*, 861 F.2d at 907.

### V

The last theory of recovery, applicable only to the early retirees, is that GM was in breach of the fiduciary duty it owed such retirees as administrator of their welfare plan. The district court dismissed this claim in its entirety, holding that an employer is not a fiduciary when it amends or terminates a plan. *Sprague I*, 768 F.Supp. at 612.

ERISA, we see no reason to treat the two forms of estoppel differently. *Cf. Flacche v. Sun Life Assurance Co. of Canada*, 958 F.2d 730, 737 (6th

■ The court's holding was correct as far as it went. GM did not act as a fiduciary in deciding to change its health insurance policies. *Lockheed Corp. v. Spink*, 517 U.S. 882, —, 116 S.Ct. 1783, 1789, 135 L.Ed.2d 153 (1996); *Musto*, 861 F.2d at 912. The plaintiffs argue, however, that the district court misconstrued the breadth of their fiduciary duty claim. The claim, they say, encompassed all of GM's oral and written representations to them in connection with the special early retirement programs. We agree with this interpretation of the complaint.

■ ERISA defines a fiduciary in functional terms:

"[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

Thus "[f]iduciary duties under ERISA attach not just to particular persons, but to particular persons performing particular functions." *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir.1990). ERISA also prescribes the responsibilities of a fiduciary, which include acting "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose" of "providing benefits to participants and their beneficiaries . . . ." 29 U.S.C. § 1104(a)(1).

In *Varity Corp. v. Howe*, 516 U.S. 489, 497–504, 116 S.Ct. 1065, 1071–73, 134 L.Ed.2d 130 (1996), the Supreme Court held that an employer acted in a fiduciary capacity when making misrepresentations to its employees about their benefit plan. The employer in that case created a new subsidiary to enable the parent to shed some of its debt, knowing that the subsidiary might well fail. *Id.* at 491–93, 116 S.Ct. at 1068. The employer induced employees to transfer to the

Cir.1992) (holding that the facts did not support a promissory estoppel theory).

new subsidiary with deliberately misleading assurances that the new subsidiary would be financially successful and that employee benefits plan would be financially sound and would not change. *Id.* at 493–95, 116 S.Ct. at 1069.

The Court held that the employer, in making these misrepresentations about the status of the plan, was exercising "discretionary authority" in connection with the plan's "management" or "administration," as those terms are used in § 1002(21)(A). *Id.* at 502–04, 116 S.Ct. at 1073. Applying the law of trusts, which it said would inform the fiduciary inquiry, *id.* at 495–97, 116 S.Ct. at 1070, the Court stated that "conveying information about the likely future of plan benefits" was a discretionary act of plan administration. *Id.* at 502–04, 116 S.Ct. at 1073. The employer therefore acted in a fiduciary capacity when it misled its employees, and its misrepresentations amounted to a breach of fiduciary duty.

■ *Varity Corp.* teaches that GM may have acted in a fiduciary capacity when it explained its retirement program to the early retirees.[14] As a matter of law, however, we do not believe that GM committed a breach of any applicable fiduciary duty. In the first place, GM never told the early retirees that their health care benefits would be fully paid up or vested upon retirement. What GM told many of them, rather, was that their coverage was to be paid by GM for their lifetimes. This was undeniably true under the terms of GM's then-existing plan.

Explanations of benefits

"tend to sound promissory by their very nature. While these explanations may state a company's current intentions with respect to the plan, they cannot be expected to foreclose the possibility that changing financial conditions will require a company to modify welfare benefit plan

provisions at some point in the future." *Gable*, 35 F.3d at 857.

GM's failure, if it may properly be called such, amounted to this: the company did not tell the early retirees at every possible opportunity that which it had told them many times before—namely, that the terms of the plan were subject to change. There is, in our view, a world of difference between the employer's deliberate misleading of employees in *Varity Corp.* and GM's failure to begin every communication to plan participants with a caveat.

■ In the second place, as we have said, GM was not required to disclose in its summary plan descriptions that the plan was subject to amendment or termination. See 29 U.S.C. § 1022(b); 29 C.F.R. § 2520.102–3. It would be strange indeed if ERISA's fiduciary standards could be used to imply a duty to disclose information that ERISA's detailed disclosure provisions do not require to be disclosed. See *Curtiss–Wright*, 514 U.S. at 84, 115 S.Ct. at 1231 (Congress did not intend the informational scheme it devised "to be supplemented by a far-away provision in another part of the statute"); *Jensen*, 38 F.3d at 952; see also Part III.A., *supra.*[15] As a matter of statutory construction, a specific statutory provision governs a general one—and here the "comprehensive" disclosure provisions control the broad fiduciary duty standard. The Fourth Circuit agrees:

"To accept the argument ... we would have to hold that ERISA's general fiduciary duty provision ... requires plan fiduciaries to furnish documents to participants and beneficiaries in addition to the documents that ERISA's specific disclosure provision ... requires the plan administrator to furnish. Such a holding would conflict with the principle that specific statutes govern general statutes." *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 657

---

14. Other than the plan documents, GM made no representations to the general retirees. We do not see how a breach of fiduciary duty could arise from GM's representations in the plan documents themselves. .

15. We are mindful that the Supreme Court has cautioned that the fiduciary duty must not be

confined to "activities already controlled by other specific legal duties...." *Varity Corp.*, 516 U.S. at 504, 116 S.Ct. at 1074. But when Congress and the Department of Labor have carefully prescribed a detailed list of matters that must be disclosed to plan participants and beneficiaries, it ill-behooves federal judges to add to that list.

(4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 738, 136 L.Ed.2d 677 (1997).

We are not aware of any court of appeals decision imposing fiduciary liability for a failure to disclose information that is not required to be disclosed. At least three circuits have held that there is no fiduciary duty to disclose planned changes in benefits or even the termination of the plan before those actions become official. *Pocchia v. NYNEX Corp.,* 81 F.3d 275, 278 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 302, 136 L.Ed.2d 220 (1996); *Payonk v. HMW Indus., Inc.,* 883 F.2d 221, 229 (3d Cir.1989); *Stanton v. Gulf Oil Corp.,* 792 F.2d 432, 435 (4th Cir.1986). *A fortiori,* there can be no fiduciary duty to disclose the *possibility* of a future change in benefits. See *Restatement (Second) of Trusts* § 173, Comment d (1959) ("Ordinarily the trustee is not under a duty to the beneficiary to furnish information to him in the absence of a request for such information").

Had an early retiree asked about the possibility of the plan changing, and had he received a misleading answer, or had GM on its own initiative provided misleading information about the future of the plan, or had GM been required by ERISA or its implementing regulations to forecast the future, a different case would have been presented. But we do not think that GM's accurate representations of its current program can reasonably be deemed misleading. GM having given out no inaccurate information, there was no breach of fiduciary duty.

### VI

Although the plaintiffs sought a jury trial on their ERISA claims, our circuit precedent teaches that they were not entitled to one. *Daniel v. Eaton Corp.,* 839 F.2d 263, 268 (6th Cir.), *cert. denied,* 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988); see also *Bair v. General Motors Corp.,* 895 F.2d 1094 (6th Cir. 1990) (same). The plaintiffs argue that subsequent Supreme Court decisions cast doubt on these precedents, see, *e.g., Chauffeurs, Teamsters, and Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990), but we need not address that question; because we reject the plaintiffs' claims as a matter of law, there was nothing for a jury to decide.

### VII

Finally, the early retirees argue that the district court erred in issuing a limited injunction pending appeal. They contend that the court should have issued an injunction coextensive with the scope of GM's liability as determined by the court. None of their claims having merit, however, the early retirees obviously are not entitled to an injunction of any sort. The injunction will be vacated.

### VIII

The certification of the class of early retirees is **REVERSED**, and the injunction is **VACATED**. Insofar as it applies to any unnamed member of the plaintiff class, the final judgment of the district court is **VACATED**. Insofar as it applies to the named plaintiffs, the final judgment is **AFFIRMED IN PART** and **REVERSED IN PART**. The parties shall bear their own costs.

LIVELY, Circuit Judge, concurring in part and dissenting in part.

As a member of the original panel that heard this appeal I voted to remand both the issues raised by the general retirees and those raised by the early retirees. Further study in light of Judge Nelson's opinion convinces me that the majority is correct in holding that the claims of the general retirees should be dismissed. Accordingly, I concur in the majority opinion to the extent it affirms summary judgment for General Motors on the claims of the general retirees.

I agree with Judge Martin's dissent, however, in its conclusion that the district court correctly certified a class action for the claims of the early retirees and that the early retirees had vested health care benefits for the rest of their lives.

There is a fundamental difference between the claims of the two sets of retirees. The general retirees based their claims solely on plan documents, which reserved the right to change terms of the plan. The early retirees, on the other hand, claimed a

new agreement with GM, supported by a new consideration—their agreement to leave their employment early, and as a consequence to save GM significant future costs. I believe the district court correctly found that GM entered into bilateral contracts with the early retirees. Further, I believe that the district court's findings of fact and conclusions of law following the bench trial are entitled to deference by this court, and should be affirmed.

With respect to the class action issue, the district court did not abuse its discretion in certifying a class consisting of the early retirees. The claims of the early retirees were all based on a common contention: that GM created a new condition for them with respect to future health care benefits by entering into new agreements that accorded them vested rights never given to general retirees. Thus, the "commonality" requirement of Rule 23(a) was satisfied.

I believe, further, the "typicality" requirement was met by the district court's creation of four subclasses, defined by the evidence upon which the early retirees relied (long form statement of acceptance, short form statement of acceptance, statement of intent to retire, and oral representations at time of entering into agreement for early retirement). The majority states that typicality is lacking because "[a] named plaintiff who proved his own claim would not necessarily have proved anybody else's claim." *Supra,* at 399. This statement appears to rely on a statement in *In re American Med. Sys., Inc.,* 75 F.3d 1069 (6th Cir.1996). Yet, what *American Med. Sys.* actually says is that "in pursuing his own claims, the named plaintiff will also *advance the interests of class members.*" *Id.* at 1082. (emphasis added). I believe the interests of class members in establishing the underlying contention that all were accorded vested rights by the new bilateral agreements would be advanced by each named plaintiff or class member pursuing his own claim. *American Med. Sys.* does not require that a named plaintiff *prove* anybody else's claim by proving his own. *American Med. Sys.* also quotes with approval the following language from *Senter v. General Motors Corp.,* 532 F.2d 511, 525 n. 31 (6th Cir.),

*cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976): "[t]o be typical a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law." 75 F.3d at 1078.

The majority concedes that while welfare plan benefits are not vested by the terms of ERISA, an employer can give up its freedom not to vest such benefits. I believe this is a case where the employer did just that. The district court found that "early retirement was presented ... as a special package deal that included health care, separate and distinct from the regular GM retirement program." *Sprague v. General Motors Corp.,* 843 F.Supp. 266, 271 (E.D.Mich.1994) (*Sprague* II). This finding is not clearly erroneous; to the contrary, it is supported by substantial evidence. Unlike the general retirees, the early retirees were sought out by GM and offered inducements to leave their employment before reaching the normal retirement age. The general retirees necessarily had to rely only on plan documents that unilaterally created health care benefits. The early retirees, on the other hand, relied on new agreements that modified the welfare benefit plan. Rather than having only the employer's unilateral "gift" of health care coverage, they bargained with the employer for their coverage. I believe under the circumstances of this case the district court properly considered the evidence of the early retirees that went beyond plan documents. The district court's findings, based on this evidence, supported its conclusion that GM was estopped to deny the early retirees lifetime health benefits.

I also believe the majority is in error in concluding that GM did not act in a fiduciary capacity in its dealings with the early retirees. While I agree that an employer does not ordinarily act as a fiduciary in administering a welfare plan, it seems to me that the manner in which GM reached early retirement agreements with these employees necessarily involved a fiduciary relationship. The majority stresses that GM was not required to state, along with its explanation to the retirees that health care coverage was to be provided for their lifetimes at GM's ex-

pense, that it also retained the right to change this commitment. I disagree. Given that GM was seeking a new agreement from those employees that changed their previous expectations about the time of their retirement, GM could not in equity remain silent if it intended to reserve a right to change or eliminate this important benefit in the future. It was misleading to tell these employees they would have company-provided health care throughout their lives while at the same time failing to advise them that it was claiming to reserve the right to withdraw the benefit after the employees accepted early retirement. Given the setting in which GM was presenting these employees with a new set of conditions relating to their retirement, GM had a fiduciary obligation to be completely open, with no undisclosed conditions.

It seems to me that the majority reads *Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), much too narrowly. In *Varity*, the Supreme Court emphasized the applicability of trust principles and the fundamental requirement of ERISA that a fiduciary "discharge his duties with respect the plan solely in the interest of the participants and beneficiaries." (quoting ERISA § 404(a)). *Varity*, 516 U.S. at 506, 116 S.Ct. at 1074. Viewed in light of trust principles and this ERISA requirement, GM owed a duty to be completely open and forthcoming with the employees that it wanted to retire early. It was unfair, at this juncture in their relationship, to rely on a reservation that was neither discussed nor referred to. This was a situation where silence was misleading. The reservations in the plan and descriptive materials all related to normal retirement. When, at GM's instigation, some employees were induced to retire early, they should have been told that these reservations applied to the new relationship created by early retirement if that was GM's intent. There was a fiduciary duty to inform them, and GM breached that duty.

I respectfully dissent from the majority's denial of all relief to early retirees, both named plaintiffs and putative class members.

MERRITT, Circuit Judge, concurring in part and dissenting in part.

I agree with two conclusions found in Judge Nelson's opinion for the *en banc* court: (1) that District Judge Feikens was correct in declining to certify the 34,000 general retirees as a class because they were on notice that General Motors could always modify their health benefits, even after retirement; and (2) that there are too many differences in the various contractual arrangements and representations made to individual early retirees to merit class certification and unified treatment. I do not agree, however, that the actions of the named plaintiffs who were early retirees should be dismissed. I agree with that portion of Chief Judge Martin's dissenting opinion that calls for a remand of this portion of the case to the District Court for consideration of the individual cases of the named plaintiffs on the merits. It appears that at least some of the early retirees had vested lifetime benefits at the time of retirement unencumbered by any reservation by GM that it retained the right to modify. These named plaintiffs should not be summarily thrown out of court merely because the class actions fail.

BOYCE F. MARTIN, JR., Chief Judge, with whom Judges MOORE and COLE join, dissenting.

The question before this Court is whether General Motors has created a lifetime right to basic health care for its retirees. The en banc majority found that former General Motors salaried employees do not have any vested right in free lifetime health care, which they were promised at their retirement. This decision not only makes it more difficult for tens of thousands of retired General Motors employees to receive the health care they thought they deserved, but it also flouts the law. Basically, the en banc majority finds no claim. It ignores ambiguities and conflates arguments. I believe that a finer caliber of analysis is necessary. I write to highlight my differences with the en banc majority and to point out shortcomings in its analysis.

The en banc majority found in General Motors's favor on every issue and claim.

The en banc majority denied class certification because it found that one group of retirees had no chance of winning on the merits and that the other group of retirees lacked the requisite typicality and commonality. It further found that the claims of the 114 named plaintiffs were without merit. According to the en banc majority, the retirees did not have a vested right to health care because General Motors effectively reserved its right to amend the plan in all cases. It also found that the retirees did not have a bilateral contract with General Motors for lifetime benefits, and that plaintiffs' estoppel claims failed because General Motors unambiguously reserved the right to change benefits. Finally, the en banc majority determined that General Motors did not breach its fiduciary duty to retirees because it gave out no inaccurate information. I disagree with the conclusions the en banc majority reached.

The facts have been stated repeatedly elsewhere, but they bear a brief recap because they weigh heavily in favor of the plaintiffs. The case involves General Motors's right to change the health care plans of 84,000 retirees. The case involves roughly 34,000 salaried employees who retired in the due course of their General Motors careers. They are the so-called "general retirees." From 1974 to 1988, General Motors offered early retirement incentive packages, and roughly 50,000 employees took early retirement at the inducement of General Motors. They are the so-called "early retirees." Both types of retirees received a variety of information from General Motors regarding employee health insurance.

A quick discussion of the particulars of the written materials General Motors distributed is a necessary predicate for the analysis that follows. The factual recitation will show that General Motors repeatedly promised retirees lifetime health care, in a variety of written materials, and only occasionally included a reservation of its right to change retiree benefits. Among the primary sources of information were booklets entitled "Highlights of Your GM Benefits" ("Your GM Benefits") and "The General Motors Insurance Program for Salaried Employees" ("General Mo-

tors Insurance"). All eight of the "Your GM Benefits" and "General Motors Insurance" booklets promised lifetime health benefits at the company's expense for salaried General Motors employees and their spouses, and only four contained any reservation of General Motors's rights to amend the agreement. According to Beach Hall, General Motors's director of health care plans, "Your GM Benefits" booklets were distributed to active salaried employees and published in 1966, 1974, 1977, 1980, and 1985. "General Motors Insurance" booklets also were distributed to active salaried employees and published in 1965, 1968, and 1971. "General Motors Insurance" booklets included a promise that "GM will pay" the health insurance costs of retirees but also noted that "GM reserves the right to modify, revoke, suspend, terminate, or change the Program." "Your GM Benefits" promised health care "at GM's expense for your lifetime" but only the 1985 edition carried any disclaimer or reservation of rights. Therefore, from 1974 to 1985 General Motors distributed employee booklets that promised free lifetime health care and contained no reservation of rights.

General Motors also published "Your Benefits in Retirement" brochures. New versions were issued in 1977, 1980, and 1985. "Your Benefits in Retirement" promised that "[y]our basic health care coverages will be provided at GM's expense for your lifetime," but also noted that "GM health care coverages . . . are subject to change in the future." In a sworn declaration, Hall wrote that the 1977 and 1985 booklets were given to salaried retirees. He did not indicate to whom the 1980 books were distributed. There was some indication that "Your Benefits in Retirement" went to active employees, but the record provides no definitive answer. This would have remained a question for the district court to answer on remand. If General Motors's Hall is correct in saying that the booklets were given to employees after they retired, though, the booklets could not have entered the calculus of the employees' decision to retire.

General Motors contracted with Metropolitan Life and Blue Cross and Blue Shield to provide insurance. During the period from

1964 to 1985 when General Motors contracted with outside insurance companies, employees received certificates of insurance from the insurers. It is not clear from the record before us whether the Metropolitan Life group insurance certificates provided lifetime health care at no cost with no reservation of rights, as plaintiffs claim. Another source of information regarding health care coverage were personal benefit summaries. These summaries came out between the late 1970s and 1985 and promised health care benefits "for your lifetime."

In 1985, General Motors became self insured. At that time, General Motors created the "General Motors Health Care Insurance Program for Salaried Employees," the "Draft Plan." According to the "Draft Plan," "[t]he Corporation shall contribute the full premium or subscription charge for health care coverages . . . ." if "suitable arrangements for such continuation can be made with the carrier(s)." It is not clear from the record before us whether the "Draft Plan" was distributed to employees or retirees. In *Sprague I*[1] the district court referred to the "Draft Plan" as an "underlying plan document[ ]," *Sprague v. General Motors,* 768 F.Supp. 605, 610 (E.D.Mich.1991), but General Motors's Hall, in apparent reference to the "Draft Plan," said in a deposition that employees had not received it or been informed of its existence. The question of the status of the "Draft Plan" should have been clarified on remand.

Finally, many early retirees signed "statements of acceptance" in which they acknowledged that they had reviewed the benefits available to them in accepting the offer of early retirement. The statements of acceptance that the early retirees signed generally came in either short or long forms, and the district court delineated subclasses among the early retiree class accordingly. The four subclasses were: "(1) those who signed 'long form' statements of acceptance; (2) those who signed 'short form' statements of acceptance; (3) those who signed 'statements of intent' to retire; and (4) those for whom no such documents can be found." *Sprague v. General Motors Corp.,* 804 F.Supp. 931, 933 (E.D.Mich.1992). In addition, the early retirees received other written and oral representations from General Motors personnel. In *Sprague II,* the district court summarized these communications nicely. *Sprague. v. General Motors Corp.,* 843 F.Supp. 266, 308–17 (E.D.Mich.1994). The written formulations of General Motors's various promises to the early retirees contained the following descriptions of lifetime health care: "Fully Paid by GM," "paid for by the Corporation for life," "continued at the corporation's expense," "a Corporation paid basis," "Corporation continues to pay full contribution for the retiree, spouse and eligible dependents," "GM paying the full cost," and "at no cost to retiree."

There are several issues in this case— vested rights, estoppel, class certification, fiduciary duty—but the underlying question is clear: Do the retirees have a right to the lifetime free health care General Motors promised them or can General Motors renege on its promise? In finding for General Motors, the en banc majority determined that General Motors was not legally bound by its promise. General Motors has profited from distributing a welter of contradictory materials on its health coverage. In light of General Motors's obscurantism, though, it seems paradoxical that General Motors would have some claims·dismissed and win others at the summary judgment stage. At the very least, plaintiffs should have the benefit of a trial on some issues to unravel the web of misinformation General Motors has woven. Instead, General Motors profits from having a salaried workforce that operated under the assumption it would receive lifetime health care. When the bill came due, though, General Motors was allowed to walk away.

To follow the en banc majority's decision, it is heads, General Motors wins; tails, the

---

1. For the sake of convenience, I have adopted the same numbering system as that used by the en banc majority for the various lower-court *Sprague* opinions: *Sprague v. General Motors Corp.,* 768 F.Supp. 605 (E.D.Mich.1991) ("*Sprague I* "); *Sprague v. General Motors Corp.,* 843 F.Supp. 266 (E.D.Mich.1994) ("*Sprague II* "); *Sprague v. General Motors Corp.,* 857 F.Supp. 1182 (E.D.Mich.1994) ("*Sprague III* ").

employees lose. I disagree with this outcome, and believe the district court's final judgment should be affirmed in part and reversed and remanded in part. As I will show, a district court could find that general retirees who retired between 1974 and 1985 did have a vested right to benefits based on the unambiguous representations of General Motors. The district court correctly found that early retirees did make a binding, bilateral contract, enforceable under federal common law, for lifetime health care when they retired from General Motors. The district court could find that all the General Motors retirees did justifiably rely on the company's promises and therefore have an estoppel-based action. The district court properly granted class certification to the early retirees and should have had the opportunity to take a fresh look at class certification for the general retirees.[2] Finally, the district court incorrectly found that General Motors had no fiduciary duty and should have reconsidered that decision on remand.

## I. Vested Rights

### A. General Retirees

General Motors repeatedly promised its retirees health care "at GM's expense" and constantly touted "improvements" in its health plan, yet it contends that it did not create a vested right to health care. The en banc majority agreed, finding that most of the summary plan descriptions unambiguously reserved General Motors's right to amend the benefits. Under the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461, health insurance is considered a "welfare" benefit as opposed to a "pension" benefit. 29 U.S.C. § 1002(1) & (2)(A). It is true under ERISA that employees do not automatically have a vested right to welfare benefits, *In re White Farm Equip. Co.*, 788 F.2d 1186, 1192–93 (6th Cir.1986), but it is equally true that a company can create vested rights to such benefits. *Id.* at 1193. A vested right is

created by "agreement or by private design." *Id.*

General Motors has created a vested right to health care through its written promises. I, like the en banc majority, find no ambiguity in much of the written material, but I do so in favor of the retirees. The steps to that conclusion are easily taken. The first question is whether the "Your GM Benefits" and "General Motors Insurance" booklets were summary plan descriptions as defined by 29 U.S.C. § 1022. If so, the focus shifts to determining what should govern when the summary plan description differs from the plan documents.

The en banc majority acknowledges that General Motors's summary booklets were summary plan descriptions. *See supra* at 400–01. The en banc majority also argues that summary plan descriptions, as a creation of ERISA, were not required until 1977. *See supra* at 400–01. It therefore considers only the post–1977 booklets to be summary plan descriptions. *See supra* at 400–01. The en banc majority's interpretation conflicts with General Motors's characterization of the booklets. Beach Hall, General Motors's director of health care plans, stated in a sworn declaration: "Although General Motors determined that it was not required to meet ERISA's formal requirements for SPDs until November 1977, it replaced the previous summary booklets with 'Highlights of Your GM Benefits' in 1974, . . . Such booklets have served as the summary plan description." In light of the way General Motors seemed to treat the 1974 booklet as a summary plan description, the district court should determine the ERISA status of the 1974 book on remand. I will base my analysis on the assumption that the post–1974 summary booklets are summary plan descriptions.

General Motors's summary plan descriptions suffer from either the internal inconsistency of contradictory terms or the external inconsistency of conflict with underlying formal plan documents. In some of the sum-

2. For the reasons enumerated above, I would find in favor of the named plaintiffs if class certification were denied. Judge Merritt, in concurring in part and dissenting in part, calls for a remand for reconsideration of the claims of the early retiree named plaintiffs. *See supra* at 408. I believe the general retirees deserve their day in court as well. It is inconceivable to me that none of the 114 named plaintiffs have stated a claim worthy of surviving dismissal.

mary plan descriptions there is no internal ambiguity—the plan guarantees lifetime health care with no disclaimer. This is true of the 1974, 1977, and 1980 "Your GM Benefits" brochures. These summary plan descriptions, however, are at odds with the underlying plan documents, which do include a reservation of rights. In *Edwards v. State Farm Mut. Auto. Ins. Co.*, 851 F.2d 134 (6th Cir.1988), this Court enunciated a principle for dealing with such discrepancies: "This Circuit has decided that statements in a summary plan are binding and if such statements conflict with those in the plan itself, the summary shall govern." *Id.* at 136. The *Edwards* principle governs pension plans and welfare plans.

From 1974 to 1985 the summary plan descriptions contained no reservation of rights and did carry a guarantee of lifetime health care. The en banc majority notes that "*Edwards* does not apply to silence," and argues that the summaries were silent on General Motors's right to change the plan. *Supra* at 401. This ignores, however, the plain import of statements such as "at GM's expense for your lifetime." Just because the summary does not speak to General Motors's rights in the same language used in the plan does not mean the summaries are silent on the issue. Noting that benefits are "for your lifetime" is tantamount to saying that General Motors cannot change the plan. In addition, the en banc majority contends that "[n]either the GM plan itself nor any of the various summaries of the plan states or even implies that the plaintiffs' benefits were vested." *Supra* at 402. Again, lifetime rights are vested rights.

It is true that from 1977 to 1985 "Your Benefits in Retirement" did include reservations of rights clauses. It bears noting, though, that these clauses were the rather tepid statement that benefits "have been changed from time to time through the years and are subject to change in the future." This clause is particularly problematic because General Motors always trumpeted its changes as improvements. The court in *Sprague II* quoted a member of General Motors's legal department telling General Motors staff: "GM is not in sound position to

win the probable lawsuit filed by retirees. Program booklets and previous pre-retirement interviews have not stressed the possibility of 'negative' program changes." 843 F.Supp. at 305. Regardless of whether the disclaimers in the "Your Benefits in Retirement" brochures act as an effective reservation of rights, the effects of such putative disclaimers are nugatory. Benefits given in documents distributed prior to, and for the duration of, retirement, cannot be rescinded in post-retirement documents. *See Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1378 (6th Cir.1994) (stating that once employee is entitled to benefit, it would be "illusory" to divest benefit retroactively) (internal quotation marks omitted); *Gentile v. Youngstown Steel Door Co.*, 1986 WL 17464 at *5 (6th Cir. Aug.25, 1986) (stating that court "must focus on the plan documents which were distributed to the retirees while they were active employees").

In sum, the district court should have had an opportunity on remand to determine whether the 1974 "Your GM Benefits" booklet was a summary plan document and whether the "Your Benefits in Retirement," in particular the 1980 edition, were distributed only to retirees. If those questions were answered affirmatively, there would be an eleven-year window from 1974 to 1985 in which the summary plan documents, which govern under *Edwards*, contained an unambiguous promise of lifetime health care. For general retirees who retired while these summary plan descriptions were in effect, this uncontradicted promise would be sufficient to vest their rights to lifetime health care. They deserved a chance to prove that in the district court.

### B. Early Retirees

The early retirees base their claims for vested rights to health care on the bilateral contracts they signed with General Motors. The en banc majority determined that such extra-plan documents carried no weight under ERISA. This Court, however, had left the question of the validity of extra-plan documents open in *Musto v. American Gen. Corp.*, 861 F.2d 897 (6th Cir.1988). In *Musto* this Court noted: "Whether, under ERISA,

employees can ever obtain vested rights in welfare plan benefits on the strength of written representations outside the official plan document is a question we need not decide." *Id.* at 907. I believe the answer should be in the affirmative in this case.

The early retirees' claims are founded on the early retirement agreements they signed and other representations General Motors made to them at retirement. These agreements, they argue, constitute binding, bilateral contracts with General Motors for lifetime health care—a bargained-for agreement. The early retirees not only gave up their jobs, but some also surrendered the right to bring causes of action, including civil rights and age discrimination claims, against the company. They argue that this mutual consideration entitles them to bring a breach of bilateral contract claim. Typically a breach of contract claim falls under state law, and ERISA preempts state law. 29 U.S.C. § 1144(a). Preemption need not sound the death knell for a contract-based claim, though. As the district court recognized, plaintiffs can make claims beyond state law.

The district court in *Sprague II* found the early retirement agreements for early retiree subclasses (1) and (2) "enforceable under ERISA as independent bilateral contracts, or as modifications of GM's health care benefit plan." 843 F.Supp. at 299. In *Sprague II*, the district court also quoted Justice Brennan: " 'The legislative history demonstrates that Congress intended federal courts to develop federal common law in fashioning' relief under ERISA." *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 156, 105 S.Ct. 3085, 3097, 87 L.Ed.2d 96 (1985) (Brennan, J., concurring), quoted in 843 F.Supp. at 301. These contracts are best enforced under federal common law.

Given that the contracts are enforceable under federal common law, the focus then turns to divining the contracts' terms. The district court in *Sprague II* argued that the agreements were not fully integrated, which opens the door to extrinsic evidence. 843 F.Supp. at 301. This extrinsic evidence, as discussed above, includes written materials showing that General Motors personnel used

almost virtually every possible permutation of the words "free lifetime health care" when presenting future benefits to employees. The district court in *Sprague II* found enforceable contracts for the subclass (1) and (2) early retirees, 843 F.Supp. at 299, and the district court noted in its Final Judgment that the subclass (4) early retirees also had enforceable contracts. That judgment should have been affirmed.

## II. Estoppel

The General Motors retirees are prime candidates for bringing an estoppel claim. General Motors clearly wanted employees, potential employees, retirees, and potential retirees to rely on its boastful presentations of its benefit programs. The 1966 "Your GM Benefits" booklets provides an example of the sort of representations General Motors was making: "Today's General Motors benefits are an important factor in making your life more enjoyable and your future more secure." The brochures in question here undoubtedly were helpful in the recruitment and retention of personnel, and, when the time came, the inducement of certain employees to take early retirement. Yet, when retirees claim that they relied on these representations, General Motors calls such reliance unjustifiable.

The en banc majority acknowledges that estoppel can be a viable theory in ERISA cases but makes a misstep in dismissing the early retirees' estoppel claim because there was no reasonable reliance. *See supra* at 400–01. The district court in *Sprague III* held that the early retirees should prevail on their promissory and equitable estoppel claims. *Sprague v. General Motors Corp.*, 857 F.Supp. 1182, 1192 (E.D.Mich.1994). The court noted: "I also find that this reliance was reasonable and justifiable. GM led the early retirees to reasonably believe that they were receiving a special deal: notwithstanding language in the plan documents to the contrary, the early retirees would receive lifetime health care benefits at no cost to them." *Id.* at 1191. Reliance on repeated assurances of free lifetime health care, sometimes couched with timid caveats, from one of the largest corporations in the world was not

justifiable in the en banc majority's view. The en banc majority erred in this determination, and the district court should have been affirmed in finding an estoppel cause of action for the early retirees.

In *Sprague III*, the district court held that any reliance on the part of the general retirees "was inherently unreasonable and unjustified." 857 F.Supp. at 1189. The en banc majority, finding the district court's determination that there were no misleading representations to general retirees "unassailable," does not even deal with the general retirees' estoppel claims. Why could the general retirees not reasonably rely on materials that repeatedly promised them lifetime health care and only occasionally included a reservation of rights? As I have shown, General Motors failed to reserve its rights in the "Your GM Benefits" brochures in effect from 1974 to 1985. In addition, when General Motors did reserve its rights, this reservation was less than clear, particularly when considered in light of General Motors's incessant touting of "improvements" to the plan and General Motors's boasting about "one of the finest and most comprehensive employe (sic) benefit packages in the industry." The issue of the reasonableness of the general retirees' reliance should have been remanded to the district court. The reliance of those who retired from 1974 to 1985 appears eminently justifiable. For other general retirees, there were sufficient representations on the part of General Motors to create a question of material fact as to whether a person justifiably could rely on them.

## III. Class Certification

Strangely, although the en banc majority is willing to paper over differences among plaintiffs in other contexts, it suddenly finds that the plaintiff group is riven with fissures when it comes to class certification. The certification of two classes, the early retirees and general retirees, is at issue.

The en banc majority denies class certification to the general retirees on the grounds that they cannot prevail on the merits. As I have shown above, the general retirees could win on the merits, which begs a fresh inspection of their class certification. The en banc

majority acknowledges that the general retirees "may have been better-suited for class treatment than the early retirees," and "base their claims on ... documents common to all salaried employees." *Supra* at 397. The generals fulfill the numerosity, commonality, typicality, and adequacy of representation requirements of Fed.R.Civ.P. 23(a). In addition, the general retirees meet the requirements of Fed.R.Civ.P. 23(b)(3) because common questions of law and fact predominate and a class action is superior to individual actions. The question of class certification for the general retirees should be remanded to the district court.

Regarding the early retirees, the en banc majority found that the district court abused its discretion in certifying a class with four subclasses. It found that, in light of their claims of bilateral contract and estoppel, the early retirees lacked the commonality and typicality requisite for class certification. I disagree with the conclusion that the district court abused its discretion when it certified a class in which all the members were seeking exactly the same remedy and doing so under the same legal theories.

This Court's recent decision in *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877 (6th Cir. 1997) supports the district court's decision to certify a class of early retirees. *Bittinger* dealt with a class of 1,200 retired employees whose lifetime insurance benefits were terminated when the collective bargaining agreement expired. *Id.* at 879. They were offered partially funded life and health insurance coverage if they agreed to sign releases of claims against the company. *Id.* Some, but not all, of the class members signed releases. *Id.* The retirees subsequently brought a class action under ERISA claiming that their "original collective bargaining agreement guaranteed them lifetime, fully-funded benefits." *Id.* at 884. The court found that "[t]his common question is all that is required by the rule." *Id.* The early retirees share the common question of what GM promised them in order to induce them to retire. To the extent there are differences, the district court could have created subclasses, as it had attempted to do. As to typicality, the Bittinger class shared many

characteristics with the Sprague early retirees. With the Bittinger class, there were numerous dates of retirement, various oral representations to members, and some members who had signed releases. *Id.* Nonetheless, the court found "[t]hat the evidence varies from plaintiff to plaintiff would not affect this basic claim." *Id.* The same is true of the Sprague class of early retirees. To the extent there were differences in the early retiree class, the district court accounted for the variations by creating four Sprague subclasses. There was no abuse of discretion in doing so. No class that includes thousands of plaintiffs will be perfectly homogeneous, and, as the Fifth Circuit noted in *Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1106 (5th Cir.1993): "The test for typicality, like commonality, is not demanding." The district court did not abuse its discretion in certifying the early retirees and should have been affirmed.

## IV. Fiduciary Duty

The en banc majority limits its discussion of fiduciary duty to the early retirees, and acknowledges that "GM may have acted in a fiduciary capacity when it explained its retirement program to the early retirees." *Supra* at 405. The en banc majority then finds, however, that General Motors did not breach this duty. "In the first place, GM never told the early retirees that their health care benefits would be fully paid or vested upon retirement. What GM told many of them, rather, was that their coverage was to be paid by GM for their lifetimes." *Supra* at 405. In essence, the en banc majority argues that even though General Motors promised free lifetime health care and later forced retirees to pay part of the bill, the initial promise was not misleading.

I disagree, and plaintiffs, both general and early retirees, should have a chance to argue their breach of fiduciary duty claims. It is true that "a company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan." *Adams v. Avondale Indus., Inc.,* 905 F.2d 943, 947 (6th Cir.1990). It is also true, however, that "a fiduciary may not materially mislead those to whom the duties of loyalty and prudence

described in 29 U.S.C. § 1104 are owed." *Berlin v. Michigan Bell Tel. Co.,* 858 F.2d 1154, 1163 (6th Cir.1988). Had General Motors never created a right to free lifetime health care, it would be free to amend or even terminate the insurance for retirees. When an employer establishes a right to lifetime health care benefits through vesting, as General Motors has done, the employer loses the unfettered freedom to amend or terminate the plan. General Motors has violated its fiduciary duty, and the district court in *Sprague I* erred in dismissing plaintiffs' fiduciary duty claim.

## Conclusion

This is a classic case of corporate short-sightedness. When General Motors was flush with cash and health care costs were low, it was easy to promise employees and retirees lifetime health care. Later, when General Motors was trying to sweeten the pot for early retirees, health care was another incentive to get employees off General Motors's groaning payroll. Of course, many of the executives who promised lifetime health care to early and general retirees are probably long since gone themselves. Rather than pay off those perhaps ill-considered promises, it is easier for the current regime to say those promises never were made. There is the tricky little matter of the paper trail of written assurances of lifetime health care, but General Motors, with the en banc majority's assistance, has managed to escape the ramifications of its now-regretted largesse.

The plaintiff class's claims for lifetime health care lie in shambles despite General Motors's repeated assurances of just such coverage. As I survey the wreckage of these claims, I am reminded that ERISA's underlying purpose is "to protect ... the interests of participants in employee benefit plans and their beneficiaries." 29 U.S.C. § 1001(b). ERISA is not a cure-all for disputes between companies and employees over welfare and pension plans, but this case provides a role for ERISA. The en banc majority opinion validates General Motors's decision to institute premiums and raise deductibles on retirees' health insurance, but the decision bestows upon General Motors the freedom to

eliminate health care coverage completely. Seemingly, any reservation of rights, no matter how weakly worded or unconnected to the grant of rights, will inure a company from having to live up to its obligations in the future. Ultimately, the en banc majority puts a new twist on an old aphorism, and what is good for General Motors is not good for the country but rather is bad for its retirees. I therefore respectfully dissent.