Francisco CERVANTES, et al., Plaintiffs,

v.

SUGAR CREEK PACKING
CO., INC., Defendant.

No. C–2–00–1316.

United States District Court,
S.D. Ohio,
Eastern Division.

Sept. 25, 2002.

James George Clymer, Agee, Clymer, Mitchell & Laret, Frederic Roy Kass, Columbus, OH, Marc David Mezibov, Christian A. Jenkins, Sirkin, Pinales, Mezibov & Schwartz, Cincinnati, OH, for plaintiffs.

Tanya A. Hubanks, Jack Frederick Fuchs, Stephen L. Richey, Thompson Hine LLP, Cincinnati, OH, Peter Eugene Tamborski, Hamilton, OH, for defendant.

## OPINION AND ORDER

SARGUS, District Judge.

This matter is before the Court on the Plaintiffs' August 31, 2001 Motion for Class Certification pursuant to Fed.R.Civ.P. 23(b)(2), or, in the alternative, Rule 23(b)(3). (Doc. 17). The ten named plaintiffs are individuals of Hispanic descent, each of whom worked for defendant Sugar Creek Packing Company at its bacon slicing plant in Washington Court House, Ohio. Plaintiffs allege that beginning in 1998 Sugar Creek adopted a plan to recruit workers from Hispanic communities outside of Ohio. Sugar Creek allegedly attracted Hispanics to accept employment in Ohio with promises of good jobs, employment benefits, good working conditions, and furnished apartments.

Once they began work at Sugar Creek, plaintiffs allege that Hispanic employees, or "recruits," were treated differently than members of the preexisting, predominately white workforce. Among other things, the complaint alleges recruits did not receive the wages they were promised; were required to work unreasonably long hours and to perform the most dangerous jobs; were denied employment benefits such as health insurance and worker's compensation; were assigned to live in overpriced and substandard company-owned apartments; were harassed

and demeaned on the basis of their race; and were denied job promotions and advancements because of their race.

Plaintiffs assert claims for racial discrimination under 42 U.S.C. § 1981, § 2000e, *et seq.*, and O.R.C. Chapter 4112, and also advance a common law claim for fraud in the inducement of an employment contract. Plaintiffs' racial discrimination claims rely on theories of both disparate treatment and disparate impact.

For the reasons that follow, the Court GRANTS plaintiffs' motion for class certification under Rule 23(b)(2).

## I. Facts

### A. General Allegations

Sugar Creek founded its bacon slicing plant in Washington Court House in 1966. Production employees are covered by a collective bargaining agreement between Sugar Creek and the United Food and Commercial Workers Union. Prior to 1998, Sugar Creek had one production shift at the plant. In mid–1998, Sugar Creek decided to expand production but found that the local labor market could not supply the workforce it needed. The company began a recruiting effort in areas where unskilled laborers were readily-available, particularly Florida, Texas, southern California, and parts of Maryland. Sugar Creek asserts that it recruited individuals of all racial backgrounds, but admits that the labor pools in the areas it recruited were "predominately Hispanic." Sugar Creek hired Spanish interpreters to help with recruiting efforts and circulated recruiting materials in both English and Spanish. Sugar Creek also had Spanish-speaking operators available to answer telephone calls to a toll free number.

Plaintiffs contend that Sugar Creek made certain promises to Hispanic individuals who showed interest in working for the company. Juan Salas, assistant to Human Resources Director Scott Procopio, answered calls from Hispanic recruits. July 2, 2001 Aff. of Juan Salas, ¶ 8. He was given a document containing information which he communicated to callers. Specifically, he told callers that Sugar Creek would "arrange bus fare" for them to get to Washington Court House, they would be provided with furnished apartments for "$50.00 per week per person for four employees in each apartment," they could earn $8.00 an hour on second shift, and they would receive benefits including "paid holidays, medical insurance, prescription plan, life insurance, disability insurance, paid vacation and bonus days for perfect attendance." *Id.*, ¶¶ 8(a)–(d). Plaintiffs allege that written recruiting materials distributed to recruits contained the same or similar information and that in some cases recruits were led to believe the apartment would be free.

Plaintiffs further contend that Sugar Creek did not keep those promises. Sugar Creek allegedly deducted bus fares from recruits' paychecks unless they remained with the company for 90 days. Employment benefits were not available unless recruits worked for 180 days. Starting wages, even on second shift, were in the range of $7.25–$7.75 per hour. Recruits who went to orientation were required to sign an agreement allowing Sugar Creek to deduct $50 per week from their pay for housing. Plaintiffs allege that the housing units—47 apartments in a complex referred to as "the Colony"—were substandard and overpriced. Plaintiffs maintain that Sugar Creek used its position as landlord to conduct surveillance of Hispanic employees and to search apartments without notice.

In addition, plaintiffs claim that Hispanics were treated differently than local, non Hispanic workers in the terms and conditions of employment. Recruits were required to purchase two "smocks" for $14 each, while local employees only had to purchase one smock. They were assigned the more difficult and dangerous jobs in the plant and were required to work longer hours and additional shifts even though local employees were not. Sugar Creek allegedly failed to properly compensate Hispanic employees for the overtime they worked. Further, Hispanics who were injured on the job were allegedly denied medical treatment and were without coverage to otherwise pay for treatment. Plaintiffs allege that non-Hispanic employees were given adequate medical treatment for on-the-job injuries.

Plaintiffs further claim that Sugar Creek enforced its disciplinary point system in a

discriminatory fashion. According to plaintiffs, Sugar Creek manipulated the disciplinary system to limit the wages, benefits, and job opportunities of Hispanic employees. For instance, recruits would allegedly be given an undue number of disciplinary points such that they were automatically terminated; Sugar Creek then would rehire the terminated employee, but wages and benefits reverted to their starting points. Plaintiffs also claim that Hispanic employees who complained of working overtime or who pursued medical treatment for job-related injuries were disciplined and sometimes terminated.

Plaintiffs also claim that Sugar Creek maintained an "English-only" rule at the plant. Hispanics who broke the rule were disciplined or yelled at by their supervisors. Further, Sugar Creek supervisors harassed and used demeaning language towards recruits. Recruits were allegedly called "lazy Mexicans," "stupid Mexicans," "dumb asses," "wetbacks," and "faggots." Plaintiffs aver that complaints about the harassment went unaddressed.

Finally, plaintiffs allege that Hispanic employees were denied opportunities for promotion and advancement. Recruits were assigned to unskilled positions in the slicing and curing departments. Qualified Hispanics, as a matter of policy, were allegedly denied the opportunity to advance to semi-skilled or skilled positions in other departments. Less qualified and less senior non-Hispanic candidates filled such positions. Plaintiffs allege that, at the time of the filing of the complaint, Sugar Creek's managerial employees consisted entirely of non-Hispanics.

### B. Facts Relating to the Named Plaintiffs

#### 1. Maria Reyes

Ms. Reyes began working for Sugar Creek in July 1999. Oct. 1, 2001 Dep. of Maria Reyes, p. 52. She was living in Miami, Florida when her son informed her about possible job openings at Sugar Creek. Ms. Reyes called the toll free telephone number and was told that she "would have living quarters." *Id.*, p. 57.[1] She believed that Sugar Creek would pay for her bus ticket. Reyes Aff., ¶ 3.

Upon arrival at the plant, Ms. Reyes and other Hispanic recruits were shown an orientation video in English. *Id.*, ¶ 5. She was given a number of documents to sign that she did not understand because they were in English. Not until after her first paycheck did Ms. Reyes learn that rent and costs for equipment were deducted. At the orientation, she was told she would start at a salary of $7.15 an hour, which would increase to $8.40 an hour at the end of one year, and that she would have health insurance. Reyes Dep., pp. 76–78. Ms. Reyes and her daughter were assigned to live in the Colony with two women who were strangers to them. "There were roaches and mice in the apartment and the water was not drinkable." *Reyes Aff.*, ¶ 4; Reyes Dep., p. 69. Rent started at $50 per week and later increased to $70 per week.

Ms. Reyes's first job was in the shipping department, but she was soon put on the production line. Reyes Dep., pp. 85–86. Her supervisor did not like Hispanics speaking in Spanish and treated Ms. Reyes "real bad." *Id.*, pp. 91–92. Ms. Reyes was given ten and a half disciplinary points even though she has never "done anything." *Id.*, p. 94. Sometimes a Caucasian employee was given Ms. Reyes's job and Ms. Reyes was given "harder work" in shipping. *Id.*, pp. 97–98. Another supervisor by the first name of Steve threw bacon at her and would say "quit talking Spanish, stupid Mexican." *Id.*, p. 103.[2] Ms. Reyes observed Sugar Creek su-

---

**1.** In her affidavit, Ms. Reyes stated that she understood that the apartment would be provided for free. Aug. 30, 2001 Aff. of Maria Reyes, ¶ 3. Her affidavit is somewhat inconsistent with her deposition testimony. For instance, Ms. Reyes stated in her deposition that she was told she could work the first shift at a starting hourly salary of $7.15, which would increase to $8.40 at the end of one year. *Id.*, ¶ 3. In her deposition, she stated that she had no conversations about her salary until she arrived at Sugar Creek. Reyes Dep., p. 64.

**2.** Much like the deposition testimony of the other plaintiffs, Ms. Reyes could identify the supervisors by only their first names.

pervisors treating and speaking to Hispanic employees in "degrading ways." Reyes Aff., ¶ 8. Hispanics were given dangerous jobs and were pressured to work harder and faster. Reyes Dep., p. 108.

Scott Procopio approved Ms. Reyes taking a two week vacation after eleven months at Sugar Creek. Reyes Aff., ¶ 7. Contrary to Mr. Procopio's assurances otherwise, Ms. Reyes lost her job when she returned. She was rehired, but her wage decreased from $8.00 to $7.15 per hour and she lost her benefits for six months. *Id.;* Reyes Dep., pp. 114–18.

Ms. Reyes is the only plaintiff currently employed by Sugar Creek.

### 2. Javier Mendoza

Mr. Mendoza became aware of Sugar Creek through a friend in 1999. He called the toll free telephone number and was promised "[i]nsurance, good salary, living quarters for free. Increase in salary. Starting from $9 and up. Free transportation. Meals. And a lot of other things." Aug. 15, 2001 Dep. of Javier Mendoza, p. 100. Mr. Mendoza was encouraged to recruit other Hispanics and was offered $50 for each person he successfully recruited. *Id.*

Mr. Mendoza arrived at Sugar Creek from Miami in September or October 1999. He was taken to the Colony and assigned to a "dirty apartment" with five other men. *Id.,* p. 108. The apartment had cockroaches, rats, and mice, and Mr. Mendoza did not have a bed. At orientation, he learned that he would be charged $50 per week for rent. *Id.,* p. 114. He also discovered that the representations about his salary and benefits "were all lies." *Id.,* p. 116.

Despite being promised an office job, *id.,* p. 104, Mr. Mendoza was assigned to work in the freezer and the smoke area. *Id.,* p. 118. Mr. Mendoza did not have adequate equipment for working in the freezer—he did not have hard boots, hard gloves, a jacket, or a hat, though Caucasian employees were provided with these items. *Id.,* pp. 123–24. He and other Hispanic employees were pushed

to work hard and were called "wetbacks" and "stinky Mexicans." *Id.,* p. 132.

On November 18, 1999, a rack of pork bellies—called a "tree"—fell on Mr. Mendoza's shoulder and back, and a meat hook cut his hand. *Id.,* p. 10. When Mr. Mendoza sought medical help, Scott Procopio threw a bandage at him and said he had to finish the shift. *Id.,* p. 15. Mr. Mendoza experienced backaches and headaches in the days following the accident, but he had to work. A Caucasian worker accused Mr. Mendoza of not working hard and being a "sissy." *Id.,* p. 26. When he told a supervisor that he could not work anymore because of his injuries, the supervisor yelled at him and called him derogatory names. *Id.,* p. 28. Mr. Procopio advised Mr. Mendoza that he would fired if he sought medical treatment. *Id.,* p. 31. On November 22, Mr. Mendoza visited a doctor for treatment. The doctor phoned Sugar Creek to see if they would pay for an x-ray exam. Sugar Creek refused to pay the cost of the exam or the visit. *Id.,* pp. 48–50. Mr. Mendoza did not return to work on the belief that he had been, or would be, fired for seeking medical treatment.

### 3. Francisco Cervantes

Mr. Cervantes worked for a trucking company in California before moving to Ohio in October 1999. He became aware of Sugar Creek through a local agency in California that was affiliated with Sugar Creek. April 18, 2001 Dep. of Francisco Cervantes, p. 47. Mr. Procopio told him that Sugar Creek would give him a position driving a truck with a starting salary of $9.00 an hour. *Id.,* p. 53. Mr. Cervantes was promised free housing. *Id.,* p. 50. When he arrived at Sugar Creek, he learned that he would have to pay for housing and the bus fare.

Mr. Cervantes was assigned to work in the press room at a starting hourly wage of $7.75. *Id.,* p. 29, Ex. 9. A supervisor twice sent him to work in the freezer as punishment.[3] Supervisors yelled at and insulted Mr. Cervantes for speaking Spanish, but he did not receive disciplinary points for speak-

---

**3.** It is unclear from Mr. Cervantes's deposition what conduct, if any, precipitated the punishment.

ing Spanish. *Id.*, p. 32. In a five week period in late 1999, Sugar Creek forced Hispanic employees to work seven-day weeks or else receive disciplinary points and possible termination. *Id.*, p. 77. Mr. Cervantes testified that Hispanics were the only employees assigned to dangerous jobs. *Id.*, p. 157.

On January 16 or 17, 2000, a tree "full of meat" fell on Mr. Cervantes and injured his neck and arm. *Id.*, p. 99. A supervisor told Mr. Cervantes that he would take him to the doctor, but the supervisor went to his office and never came back. *Id.*, p. 101. The next day, Mr. Cervantes was required to work in the press room even though his arm hurt. Mr. Cervantes, on his own accord, visited a doctor on January 23 because his neck and arm were swollen, he could not sleep, and he experienced pain and a pinching sensation. *Id.*, pp. 105–108. Mr. Cervantes did not return to work at Sugar Creek.

### 4. Carmen Diaz

In July 1999, Ms. Diaz contacted Sugar Creek's telephone line and was told that she could get a starting hourly salary of $7.50–$7.75 with opportunities to advance. Aug. 7, 2001 Dep. of Carmen Diaz, p. 47. She was told that she would be eligible for benefits after three months on the job. *Id.*, p. 67.

Ms. Diaz moved from Maryland and was assigned to live in the Colony with her husband, plaintiff Carlos Navarro, and two other men. Ms. Diaz was told that recruits who did not live in the Colony would be terminated. *Id.*, p. 80. The apartment was "full of cockroaches and mice. The stove didn't work. The refrigerator didn't work." *Id.*

Ms. Diaz packaged bacon in the shipping department. *Id.*, pp. 86–7. Her supervisor yelled at her and other Hispanic employees, calling them "stupid," "dumb," and "slaves." *Id.*, p. 90. Ms. Diaz experienced pain in her arm while on the job. The supervisor said that she would lose her job if she did not keep working. *Id.* She requested permission to seek medical treatment, but was not allowed to obtain the services. *Id.*, p. 110. In December 1999, Ms. Diaz visited a doctor and was told that her insurance card "wasn't good at all." *Id.*, p. 111.

The pain in Ms. Diaz's arm worsened and she did not go to work on February 25, 2000. Mr. Navarro informed Mr. Procopio that his wife was in pain. Mr. Procopio said that they would have to pay $75 to see a doctor. *Id.*, pp. 120–21. She went to the hospital on February 29 and was told that her insurance card was invalid. *Id.*, p. 126. On March 3, Ms. Diaz went to see Mr. Procopio, who threw her out of his office. Three days letter, she received a letter demanding that she and her husband vacate her apartment. *Id.*, p. 135.

### 5. Julio Montoya

Mr. Montoya met Mr. Procopio and Mr. Salas during a recruiting visit to Bradenton, Florida. June 6, 2001 Dep. of Julio Montoya, p. 20. Mr. Salas promised him a "good salary," "good benefits," "a good opportunity for advancement." *Id.*, pp. 23–4. He was told that he could get a "nice" apartment through the company for $30 a week. *Id.*, p. 25. Mr. Montoya came to Sugar Creek around August 1999 and learned that his rent was $50 a week and that he would have to share an apartment with other employees.

Mr. Montoya worked in the pump room where he hung pork bellies on metal trees. He testified that he was subject to humiliation and discrimination. *Id.*, p. 59. Recruits were referred to as "stupid people." *Id.*, p. 74. Mr. Montoya had boxes thrown at him, and once a supervisor pushed him up against a table by running a cart of bacon into him. *Id.*, p. 76. When the doors to the men's bathroom were removed for repair, non-Hispanics were allowed to use the supervisors' bathroom but Hispanics were not. *Id.*, p. 87–89. A supervisor yelled at Hispanic employees in the pump room to speak English only. *Id.*, p. 90.

On Mr. Montoya's first day on the job, cardboard cut his hand and caused it to bleed "profusely." *Id.*, p. 104. Despite the hand injury, he was assigned to perform jobs that required the use of both hands and was yelled at to speed up his work. Mr. Montoya suffered another injury to his hand at work, and a coworker from Sugar Creek took him to a doctor. *Id.*, pp. 106–10.

Sugar Creek initially terminated Mr. Montoya on November 22, 1999 because of too many disciplinary points. *Id.*, p. 95. He was not given notice that he was being given the points or why they were being given. Sugar Creek rehired Mr. Montoya as a new hire on November 26, 1999 and again assigned him to the pump room. He was terminated on December 17, 1999. *Id.*, Ex. 8.

### 6. Carlos Navarro

Mr. Navarro learned of Sugar Creek from a friend when he was in Maryland. In July 1999, he called Sugar Creek and was told that he would have employment benefits, a "very neat" apartment, and that he would be treated well. Aug. 9, 2001 Dep. of Carlos Navarro, pp. 63–65. It was his understanding that he would in fact have to pay rent for the apartment.

When Mr. Navarro arrived at Sugar Creek, he found that the "apartment was real bad." *Id.*, p. 66. The bus fare was deducted from his paycheck. *Id.*, p. 73. He and his wife, Carmen Diaz, watched an orientation video in English, which they did not understand. Mr. Navarro was initially assigned to the shipping department and later worked in the press department. *Id.*, pp. 79–81. His supervisor pushed him to do more work than he could do, threw bacon at him, and told him not to talk in Spanish. *Id.*, pp. 81–85. Supervisors by the first names of Steve and Mark harassed Mr. Navarro and other Hispanic employees. *Id.*, p. 90. The company assigned Hispanics to the most physically demanding jobs. *Id.*, p. 136.

Sugar Creek terminated and rehired Mr. Navarro three times. Twice he traveled to Miami with Mr. Procopio's permission, but was required to "fill out the papers like a new employee" when he returned. *Id.*, p. 96. The third occasion apparently involved a dispute between Sugar Creek and Mr. Navarro about rent money. Following the dispute, he had to fill out paperwork as a new employee. *Id.*, pp. 97–98.

Unlike Caucasian employees, Hispanic employees were required to work overtime; they received disciplinary points if they did not. *Id.*, p. 128. Mr. Navarro testified that he was qualified for promotions but less-qualified Caucasians received the positions. *Id.*, pp. 129–30. He recalled two or three Hispanics receiving promotions.

Mr. Navarro was terminated on March 6, 2000 following his wife's discharge from employment.

### 7. Dianna Neacsu

Ms. Neascu came to Sugar Creek with her husband, plaintiff Carlos Rubi, from Miami in August 1999. Aug. 17, 2001 Dep. of Dianna Neacsu, p. 69. She learned of Sugar Creek through a temporary agency. Juan Salas promised Ms. Neascu and her husband that they would start out at $8.00 an hour and reach $12.00 an hour after one year. *Id.*, p. 139. Mr. Salas promised benefits upon working at Sugar Creek for three months. They were promised an apartment of their own and believed that the apartment would be provided for free. *Id.*, p. 143.

They were assigned to an apartment with another person living in it. *Id.*, p. 77. The apartment had roaches, mice, flies, and no air conditioning. *Id.*, p. 153. Ms. Neascu believed that they were essentially required to live in the Colony because they could not make enough money to move out.

Ms. Neacsu worked at the "round table" where types of bacon were separated. The starting salary was $7.00 an hour. *Id.*, p. 153. The supervisor gave her the hardest work and yelled at her. *Id.*, p. 46. Ms. Neacsu testified that the "supervisors treat[ed] us all bad. All the Hispanics." *Id.*, p. 20. Her supervisor, Pauline, pushed her to "hustle, hustle, hustle. I felt like a slave." *Id.*, p. 21. She was told that she could only speak English.

On February 28, 2000, Mr. Procopio told Ms. Neascu and her husband to leave the apartment. *Id.*, p. 193. She considered that to be the termination of her employment.

### 8. Jose Pineda

Mr. Pineda learned of Sugar Creek through his cousin in southern California. His cousin relayed to him that Mr. Procopio promised "better benefits," a starting salary of a little over $7.00 an hour, and raises to $9.00 within a couple of months. Apr. 11, 2001 Dep. of Jose Pineda, p. 15.

Mr. Pineda began working for Sugar Creek in February 1999 and quit for the first time in June 1999. *Id.*, p. 35. He worked in the area known as "precook." He testified that he was happy with his job at Sugar Creek during this first period of employment, though he did not receive the raises that were promised and his living situation was not satisfactory. *Id.*, pp. 27, 35–37. The apartment had roaches and mice. *Id.*, p. 100. Mr. Pineda quit his job to go to Mexico.

Sugar Creek hired Mr. Pineda again in August 1999, and he quit in February 2000. He worked on the production line. During this second period of employment, "[t]he supervisors treated us badly." *Id.*, p. 41. Mr. Pineda and other Hispanic employees were yelled at and pushed to work harder than they could. They were called "stupid" and "f——ing Hispanic." *Id.*, p. 43. One supervisor threw a pack of bacon at him and was "[n]agging and yelling" at Hispanics "all the time." *Id.*, p. 48. Non–Hispanic employees did not receive such treatment.

Mr. Pineda suffered an accident near the end of January 2000. An empty pallet fell while he was pulling it from a forklift. *Id.*, p. 59. The pallet apparently hit his face or neck and caused swelling and an infection. Mr. Pineda went to the hospital two days later and was prescribed medication. When he approached the company about paying for his medical treatment, Mr. Pineda was yelled at and told the company would not pay anything. *Id.*, p. 63.

#### 9. Carlos Rubi

Mr. Rubi came to Sugar Creek in August 1999 with his wife, plaintiff Dianna Neacsu. Mr. Rubi testified that they were promised jobs starting out at $8.00 an hour, which would reach $12.00 an hour after one year. Aug. 3, 2001 Dep. of Carlos Rubi, p. 93. They were given bus tickets and money for food, believing they would not be required to pay back the money. They were promised an apartment of their own and believed that the apartment would be provided at no cost. *Id.*, p. 97.

Upon arriving at Sugar Creek, Mr. Rubi learned that his starting wage would be $7.00 an hour. *Id.*, p. 106. He worked packing bacon in the pump room. The job required him to lift barrels full of bacon that weighed 80 to 100 pounds. Mr. Rubi asked for help lifting the barrels, but his supervisor yelled at him and called him "stupid." *Id.*, p. 121. The supervisor told him not to speak Spanish. *Id.*, p. 131. His hands swelled and he asked to be transferred to an open position in sanitation. Eventually, the supervisor transferred him to that position. *Id.*, p. 122.

Mr. Rubi received a bachelors degree in business administration from a university in Madrid, Spain. *Id.*, pp. 71–72. Mr. Rubi asserted that he was qualified to be a supervisor or crew leader. *Id.*, p. 168. Sugar Creek did not allow Hispanic employees to occupy such positions. Mr. Rubi recalled two Caucasians with less experience at Sugar Creek who were promoted to supervisor. *Id.*, pp. 170–71.

On February 7, 2000, Mr. Rubi slipped in the parking lot and injured his hand. *Id.*, p. 137, Ex. 2. Mr. Procopio gave him a bag of ice and "said it's nothing." *Id.*, p. 78. Mr. Rubi had to wait three hours before someone took him to the hospital. The doctor diagnosed him with a fractured left wrist. *Id.*, p. 141. Sugar Creek made him work the next day and assigned him to a job labeling boxes that required the use of both hands. *Id.*, pp. 78, 141. Mr. Procopio told Mr. Rubi that Sugar Creek would not pay the medical bill, though Mr. Rubi eventually received workers' compensation for the treatment. *Id.*, p. 144.

Mr. Rubi dropped off a note with Mr. Procopio on or after February 11; the note was from his doctor and explained that Mr. Rubi was unable to work. *Id.*, Ex. 11. Mr. Rubi did not return to work after that point. At the end of the month, Mr. Rubi and his wife received notice that they were to vacate their apartment. *Id.*, p. 145.

#### 10. Maria Souverbielle

Ms. Souverbielle learned of Sugar Creek through an acquaintance in Mississippi. May 31, 2001 Dep. of Maria Souverbielle, p. 62. She called the toll-free number and spoke with Juan Salas. He told her that she would start at an hourly salary of $7.50 or $8.00 (depending on the shift she worked), Sugar

Creek would provide "very good incentives, very good benefits," and Sugar Creek would pay her bus fare. *Id.*, p. 65. Ms. Souverbielle was later told that she would have an "apartment in very good condition, clean, furnished." *Id.*, p. 68.

Ms. Souverbielle and her boyfriend arrived at Sugar Creek in late July 1999. *Id.*, p. 73. They were given a "dirty and smelly" apartment with furniture and appliances that were in poor condition. *Id.*, p. 47. Though Ms. Souverbielle stated that she could live outside the Colony, she "didn't have any options" besides living there. *Id.*, p. 88.

Ms. Souverbielle initially worked a job wrapping bacon in plastic, but she was soon assigned to weighing bacon. This job required her to lift boxes weighing from 15 to 35 pounds. *Id.*, pp. 86–87. Supervisors told her not to speak Spanish *Id.* p. 126. She was pressured to work harder.

Ms. Souverbielle was terminated for the first time in mid-September 1999 for unexcused absences. She testified that she had presented documentation and medical records to Sugar Creek explaining the absences. *Id.*, p. 90.[4]

Sugar Creek rehired Ms. Souverbielle on October 13, 1999. She again worked in the weighing room. She suffered a back injury on October 20 when she lifted an "unusually heavy box." *Id.*, Ex. 17. She reported the accident to her supervisors, who told her to go back to work. She asked for "a special belt," which Sugar Creek provided for a fee. *Id.*, p. 99. The pain worsened and she filed an injury report with Sugar Creek on November 6, 1999. A supervisor gave Ms. Souverbielle permission to visit a doctor on November 6. The doctor diagnosed a lumber strain and restricted her to sit down duty until November 18. *Id.*, Exs. 18, 19. Sugar Creek refused to pay for her medication. Ms. Souverbielle made several more doctors visits.[5] About December 20, Mr. Procopio informed Ms. Souverbielle that she was fired. *Id.*, p. 115.

### C. Claims for Relief

The amended complaint brings four claims for relief. First, plaintiffs allege that Sugar Creek intentionally discriminates against Hispanics in violation of Title VII, 42 U.S.C. § 1981, and O.R.C. Chapter 4112. Second, plaintiffs assert that Sugar Creek's rules and policies had, and continue to have, a disparate impact upon the terms and conditions of employment for Hispanic employees.

Third, plaintiffs claim that Sugar Creek's conduct in "luring" Hispanics to accept employment constitutes fraud in the inducement of an employment contract at common law. Fourth, plaintiffs allege that Sugar Creek violated Ohio public policy against employment discrimination on the basis of national origin.

Plaintiffs seek declaratory and injunctive relief including: reinstatement to their former employment; requiring Sugar Creek supervisors and managers to undergo cultural sensitivity and related training; establishing a program for registering and investigating complaints of racial discrimination; instituting a program that would provide Hispanics equal employment opportunities at Sugar Creek; and requiring Sugar Creek to truthfully represent wages, benefits, and opportunities to prospective employees. Plaintiffs further seek compensatory damages for lost wages and benefits, front pay (if reinstatement is not practicable), and emotional distress stemming from Sugar Creek's English-only policy.

### II. Definition of the Class

A court "must first consider whether a precisely defined class exists and whether the named plaintiffs are members of the proposed class." *Reeb v. Ohio Dept. of Rehabilitation*, 203 F.R.D. 315, 319 (S.D.Ohio 2001) (citing *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977); *Reid v. White Motor Corp.*, 886 F.2d 1462, 1471 (6th Cir. 1989)). Key elements to defining a class

---

**4.** It is unclear from her deposition what the nature of Ms. Souverbielle's medical problems was in August and September 1999, and whether those problems were work-related.

**5.** While the amended complaint alleges that Ms. Souverbielle returned to work in November 1999, it appears from her deposition testimony that she did not.

include: "(1) specifying a particular group that was harmed during a particular time frame, in a particular location, in a particular way, and (2) facilitating a court's ability to ascertain its membership in some objective manner." *Reeb*, 203 F.R.D. at 319 (citing *Crosby v. Soc. Sec. Admin.*, 796 F.2d 576, 580 (1st Cir.1986)).

A class is not properly defined when a court "must come to numerous conclusions regarding class membership or must adjudicate the underlying issues on behalf of each class member." *Reeb*, 203 F.R.D. at 319. However, "[i]t is within the prerogative of the court to construct a definition of the class" if a defect in the proposed definition can be readily cured. *Metcalf v. Edelman*, 64 F.R.D. 407, 409 (N.D.Ill.1974); *Reeb*, 203 F.R.D. at 320 (redefining class of female prison employees to exclude future hires and non-union members).

The amended complaint proposes the following class definition:

> All Hispanics who are or were nonexempt employees of Sugar Creek Packing Co. at its Washington Court House, Ohio facility from two years prior to the date of the initial Complaint through the present.

Am. Compl., ¶ 82.

Defendant objects to the definition on the ground that it is "open-ended." Defendant argues that the class should be limited to the time frame of November 13, 1998 through November 13, 2000, the date of the filing of the original complaint. Further, defendant contends that the proposed definition could allow supervisory personnel into the class.

Plaintiffs respond that the time frame should be from November 13, 1998 through the date of the trial. Plaintiffs argue that they primarily seek injunctive relief and that current employees would benefit from such relief. Plaintiffs state that they are unaware of any "nonexempt" employees who are supervisors, but are willing to amend the definition to read "non-supervisory" employees.

The Court finds that the class definition passes muster. Defendant has offered no reasoned basis to exclude current employees other than to express its reluctance to conduct further discovery. The amended complaint alleges that Sugar Creek's discriminatory practices and policies are ongoing. Thus, if plaintiffs' allegations are true, then current employees have suffered from discrimination and are entitled to relief. At some point, however, discovery must terminate for an orderly trial to be conducted. The claims are therefore limited to facts occurring on or before January 1, 2003.

The Court will accept plaintiffs' proposed alteration excluding supervisory employees. Accordingly, the definition of the class is:

> All Hispanics who are or were non-supervisory employees of Sugar Creek Packing Co. at its Washington Court House, Ohio facility from November 13, 1998 through January 1, 2003.

### III. Standard for Class Certification

District courts are required to conduct a "rigorous analysis" into whether the prerequisites of Fed.R.Civ.P. 23 are met before certifying a class. *See General Telephone Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The Court has broad discretion in deciding whether to certify a class, but that discretion must be exercised within the framework of Fed.R.Civ.P. 23. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981); *see also Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir.1974). The party seeking class certification bears the burden of proof. *See Cash v. Swifton Land Corp.*, 434 F.2d 569, 571 (6th Cir.1970); *see also In re American Medical Systems, Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996).

To meet this burden, plaintiffs must first show that all four of the prerequisites of Fed.R.Civ.P. 23(a) are satisfied. *See American Medical*, 75 F.3d at 1079. These prerequisites are often referred to as the numerosity, commonality, typicality, and adequacy of representation requirements. After showing that these requirements are satisfied, plaintiffs must demonstrate that the action falls within at least one of the subcategories of Rule 23(b). *Id.* An action is not maintainable as a class action merely because it is designated as such in the pleadings. *See Cash*, 434 at 571. A mere recitation of the language of Rule 23(a) is not enough. *See*

*Weathers,* 499 F.2d at 1200. Rather, "[t]here must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled." *Id.*

## IV. Discussion

### A. Requirements of Rule 23(a)

#### 1. Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). There is no bright line numerical test by which the district court can determine when the numerosity requirement is satisfied, and the Sixth Circuit has noted that a class action does not require any specific number of members: "Impracticability of joinder is not determined according to a strict numerical test but upon the circumstances surrounding the case." *Senter v. General Motors Corp.,* 532 F.2d 511, 523 n. 24 (6th Cir.1976). When class size reaches substantial proportions, however, the numerosity requirement is usually satisfied by the numbers alone. *See American Medical,* 75 F.3d at 1079.

■ Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required. *See Arkansas Educ. Ass'n v. Bd. of Educ. of Portland,* 446 F.2d 763 (8th Cir.1971); *Samuel v. Univ. of Pittsburgh,* 56 F.R.D. 435 (W.D.Pa.1972). "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *General Telephone Co. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). Factors which a court may consider include judicial economy, geographical dispersion of class members, and the financial resources of class members. *See Jackson v. Foley,* 156 F.R.D. 538, 542 (E.D.N.Y.1994) (citing *Robidoux v. Celani,* 987 F.2d 931, 936 (2d Cir.1993)).

"[T]he duty of establishing ... particular circumstances rests with the party who asserts the existence of the class and that party must produce some evidence or otherwise establish by reasonable estimate the number of class members who may be involved." *Rex v. Owens,* 585 F.2d 432, 436 (10th Cir.

1978). Nonetheless, it is permissible for a plaintiff to make reasonable inferences drawn from available facts and an "information monopoly [by the party opposing the class] will not stand in the way of persons seeking relief." *Jackson,* 156 F.R.D. at 542.

■ Here, plaintiffs maintain that the class consists of at least 975 Hispanic employees and former employees. Based on personnel files produced by Sugar Creek, plaintiffs represent that approximately 975 Hispanics were employed by Sugar Creek between November 1998 and May 2001. Presumably, the number is higher when taking into account employees hired after May 2001. Defendant does not dispute plaintiffs' estimation of the class size. Rather, defendant repeats its argument, rejected above, that the class is not sufficiently defined.

The Court concludes that the numerosity requirement is satisfied. Joinder of the class is impracticable. While current Hispanic employees live in a geographically concentrated area, former employees likely do not. Several plaintiffs testified that they left the Washington Court House vicinity once their employment with Sugar Creek ended. For instance, Mr. Rubi now lives in Florida, and Ms. Diaz and Mr. Navarro live in North Carolina. This is likely to be true for others in the class because, having come to Ohio from other parts of the country, the former employees have no particular ties to Ohio. Further, it is clear from the deposition testimony that the financial resources of the class members are generally quite limited. Several plaintiffs testified that they did not have enough money to pay bus fare to Ohio or to move outside of the company-owned apartments.

#### 2. Commonality

■ Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). The claims of the potential class members need not be factually identical. *See Putnam v. Davies,* 169 F.R.D. 89, 93 (S.D.Ohio 1996). Rather, "the commonality requirement will be satisfied as long as the members of the class have allegedly been affected by a general policy of the Defendant and the general policy is the

focus of the litigation." *Id.; see also Mayo v. Sears, Roebuck & Co.,* 148 F.R.D. 576, 580 (S.D.Ohio 1993). Although Rule 23(a)(2) speaks of "questions" in the plural, there need only be one question common to the class. *See Sprague v. General Motors Corp.,* 133 F.3d 388, 397 (6th Cir.1998) (en banc) (citing *American Medical,* 75 F.3d at 1080). The mere fact that questions peculiar to individual class members could remain does not necessarily defeat a finding of commonality. *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1197 (6th Cir.1988); *Bacon v. Honda of America Mfg., Inc.,* 205 F.R.D. 466, 476 (S.D.Ohio 2001).

Conclusory allegations of commonality are insufficient to satisfy the burden of proof on certification. *Falcon,* 457 U.S. at 157, 102 S.Ct. 2364; *American Medical,* 75 F.3d at 1081. "[T]here is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims." *Falcon,* 457 U.S. at 157, 102 S.Ct. 2364. The class representatives must enumerate questions of law or fact common to the class, "the resolution of which will advance the litigation." *Sprague,* 133 F.3d at 397.

Plaintiffs enumerate these questions as common to the class: (1) whether Sugar Creek intentionally targets Hispanics for recruitment and utilizes false or misleading information to induce Hispanics to accept employment; (2) whether Sugar Creek treats Hispanic employees differently than non-Hispanics in the terms and conditions of employment; (3) whether Sugar Creek maintains a workplace that is hostile toward Hispanic employees; and (4) whether Sugar Creek, as a matter of policy or practice, refuses to consider Hispanics for promotions and advancements.

Defendant argues that class certification is improper because the claims of the named plaintiffs are "varied and conflicting." Defendant contends that the alleged promises or representations made to recruits varied from individual to individual. Some talked to Juan Salas, others spoke to a man by the first name of Rico, and others talked to Mr. Procopio. Though the complaint alleges that Sugar Creek distributed written recruiting materials, no plaintiff testified to seeing or relying on such materials. The plaintiffs offered testimony about the starting salaries they were promised, ranging anywhere from $7.00 to $9.00 an hour. Some plaintiffs thought the apartments were free, but others did not. Defendant states that its policy regarding the bus fare changed several times—some recruits were given free bus fare, while others were charged if they did not work 90 days.

Defendant further argues that plaintiffs have not demonstrated the existence of any company-wide policies by which Hispanics are given the most difficult and dangerous jobs. According to defendant, work assignments are dictated by seniority under the collective bargaining agreement. Likewise, defendant contends that the disciplinary system is covered by the bargaining agreement and plaintiffs are unable to demonstrate that Hispanics are disciplined more severely. To the extent that a plaintiff has a claim for receiving unfavorable work assignments or undue punishment, defendant maintains that such a claim would require individualized consideration. Defendant offers the same argument concerning plaintiffs' claims that they were denied work-related benefits, such as health insurance.[6]

With respect to promotions, defendant states that 24 Hispanic production workers have been promoted to supervisory positions. Nov. 30, 2001 Aff. of Scott Procopio, ¶ 61.

---

**6.** The defendant argues that its collective bargaining agreement controls promotions and work assignments. (Mem. In Opp., p. 51) The defendant, however, has failed to attach the collective bargaining agreement in its entirety. The Court cannot determine, for example, if the agreement covers promotions to supervisory positions, which collective bargaining agreements typically do not. Further, the Court is unable to determine from the limited submission if a plaintiff complaining of work assignments could make use of a grievance and arbitration procedure.

Why a particular person was not promoted would depend on individual variables, says defendant, such as their qualifications, fluency in English, and attendance record. Defendant argues that plaintiffs have failed to establish that they were qualified for any promotions.

The Court concludes that plaintiffs have satisfied the commonality requirement. Defendant is correct that the individual facts vary from plaintiff to plaintiff. Rule 23(a)(2), however, requires commonality, not identical facts. See *Putnam*, 169 F.R.D. at 93. Although the promises conveyed to recruits may have varied somewhat—one recruit may have been promised $9.00 an hour with $50 rent, while another was promised $7.50 an hour with no rent—the common question is whether Sugar Creek made misrepresentations to Hispanic recruits for the purpose of convincing them to accept employment. That is, the representations may have varied, but the key issue is whether they were *mis*representations.

Defendant cites *Sprague v. General Motors Corporation, supra,* in arguing that examination of an employer's promises to employees calls for individualized inquiries. In *Sprague,* retired General Motors employees alleged that GM violated the Employee Retirement Income Security Act by denying them full "paid-up" lifetime health care benefits. The district court certified a class of some 50,000 employees who had taken early retirement, but the court declined to grant class status to about 34,000 "general retirees" who had retired in accordance with the company's normal criteria. The Sixth Circuit affirmed the judgment of the district court as to the general retirees, but reversed the court's certification of the class of early retirees. See *Sprague,* 133 F.3d at 393.

The Sixth Circuit found that by the time the district court ruled on the certification question, the early retirees were left with a bilateral contract theory and an estoppel theory. *Id.* at 397–398. The court concluded that neither the bilateral contract theory nor the estoppel theory were susceptible to class-wide treatment. The court found that the bilateral contract theory could not support a class action because the premise of

the theory was that GM had made an individual "side deal" with each early retiree and proof that GM had contracted to confer vested benefits on one early retiree would not necessarily prove that GM had made such a contract with another early retiree. *Id.* at 398. The court also found that the estoppel theory could not support a class action because GM's statements to the early retirees were not uniform. The Court observed that an estoppel claim focuses on individualized proof of what statements were made to a particular person, how the person interpreted those statements, and whether the person justifiably relied on the statements to his detriment. *Id.* Because each plaintiff's claim depended upon facts and circumstances peculiar to that plaintiff, the court concluded that class-wide relief was not appropriate. *Id.*

Significantly, plaintiffs in this suit are claiming group-based discrimination and do not rely on estoppel or bilateral contract theories. Thus, unlike *Sprague,* the focus is not on the individual "side deals" Sugar Creek made with recruits. Rather, the focus is on whether Sugar Creek targeted Hispanics in their recruiting efforts and whether Sugar Creek made misrepresentations to Hispanic recruits to induce them to accept employment. Whether the "side deals" varied from recruit to recruit is not of great importance. See *Mick v. Level Propane Gases, Inc.,* 203 F.R.D. 324, 329 (S.D.Ohio 2001) ("[W]hile Plaintiffs may have entered into differing contractual relationships with Level, the common question of whether Level's practices are false, misleading and deceptive remains for resolution.").

Turning now to defendant's other arguments, the Court declines defendant's attempt to delve into the merits of this case. See *Bacon,* 205 F.R.D. at 476 (noting that the court "may probe behind the pleadings" to analyze the Rule 23 prerequisites but may not "delve into the merits"). The Court, in Part I.B above, reviewed plaintiffs' depositions to determine if the testimony supported the factual allegations of the amended complaint. Defendant invites the Court to weigh additional evidence, including affidavits and other depositions submitted by Sugar Creek,

against plaintiffs' depositions and decide which is more credible. This exercise is beyond the scope of the inquiry as to whether class certification shall occur.

The testimony of plaintiffs supports the complaint's assertion that Sugar Creek's practice was to discriminate against Hispanic employees and create, or at least tolerate, a hostile work environment. Though not every plaintiff shared identical experiences, plaintiffs testified that Hispanics were: (1) required to work more difficult and dangerous jobs, and to work longer hours than non-Hispanics; (2) denied employment benefits that were extended to non-Hispanic employees; (3) assigned to live in substandard apartments; (4) unduly punished and sometimes terminated so that Sugar Creek could rehire them at their beginning salary; (5) denied medical attention; (6) pressured to work harder; (7) called derogatory names; and (8) prohibited from speaking Spanish. Upon these allegations and supporting facts, the Court cannot conclude that plaintiffs' claims are "varied and conflicting." *See Reeb*, 203 F.R.D. at 321 n. 3 ("All of the alleged discriminatory practices are based on the same theory of disparate treatment of female employees at [the place of employment], whether it be in promotions, overtime, posts, or discipline."). This is not a situation where a handful of employees alleged individual discrimination. Rather, plaintiffs assert the existence of a class of persons who have suffered the same alleged injuries as a result of Sugar Creek's alleged policies. Resolution of the questions of law and fact surrounding Sugar Creek's policies and practices will advance this litigation. *See Falcon*, 457 U.S. at 157, 102 S.Ct. 2364; *Sprague*, 133 F.3d at 397.

The testimony is less clear as it concerns Sugar Creek's alleged refusal to promote Hispanics to supervisory positions. While the testimony is less direct, the plaintiffs who testified on this issue stated that Sugar Creek, in wholesale fashion, would not consider Hispanics for supervisory positions. Defendant vigorously disputes this conclusion. At this juncture, however, the Court does not examine the merits of the claim. *See Reeb*, 203 F.R.D. at 319 ("The Plaintiffs have met the commonality requirement by alleging that the Defendant has engaged in a general pattern or practice of discrimination against women that violates Title VII by its various employment actions and decisions that have disproportionately harmed female employees.").

### 3. Typicality

■ Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *American Medical*, 75 F.3d at 1082 (citation omitted). Typicality exists when the "representative's interests [are] aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Id.* According to the Sixth Circuit, "as goes the claim of the named plaintiff, so go the claims of the class." *Sprague*, 133 F.3d at 399; *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir.2000).

■ The typicality requirement focuses on the type of injury suffered by the class members and the interests of the various class members. *See Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 64 (S.D.Ohio 1991). The commonality and typicality requirements are closely related because they both help determine whether the claim of the named plaintiff and those of the class are so interrelated that the interests of the absent class members will be protected. *Id.* Similar to the commonality requirement, while the named plaintiff's claims do not have to be identical to the claims and defenses of the other members of the putative class, there must be a common element of fact or law between the claims. *See Putnam*, 169 F.R.D. at 94.

■ Defendant raises four ways in which the named plaintiffs' claims are not typical of those of the putative class. First, many of the plaintiffs testified that they suffered work-related injuries and were denied ade-

quate medical treatment. Defendant asserts that this experience is not typical of Sugar Creek production employees. Defendant has submitted the affidavit of Jean Doughty, Plant Office Manager, who states, "Nearly ninety percent of the 975 Hispanics who Plaintiffs list as putative class member have never filed workers compensations claims." Nov. 30, 2001 Aff. of Jean Doughty, ¶ 6. Second, several of the plaintiffs claimed to have been treated unfairly under the disciplinary system. Defendant asserts that "the vast majority" of class members never experienced any disciplinary problems.

Third, only plaintiff Maria Reyes has worked at Sugar Creek for a majority of the class period. Defendant argues that the remaining plaintiffs, who generally worked for Sugar Creek from mid–1999 to early–2000, had experiences different from those who worked at other times in the class period. Mr. Pineda testified that he was happy with his job from February to June 1999. Fourth, defendants contend that the allegations of the named plaintiffs' are limited to a small number of supervisors. The alleged experience under these supervisors is not typical of Hispanic employees' experience with other supervisors.

The Court concludes that the typicality requirement is satisfied. It is to be expected that not every person who has worked at Sugar Creek has suffered a job-related injury. That some portion of the class has not experienced an accident does not preclude class certification. The focus is on the type of legal injury suffered, and plaintiffs bring suit for discrimination, not workers' compensation. Sugar Creek's alleged discriminatory practices may have manifested themselves to particular employees in different ways, but the common thread is the allegation that all the class members suffered from the alleged racial discrimination. *See Harris v. City of Chicago,* Nos. 96 CV 3406, 96 CV 7526, 1998 WL 59873 at *5 (N.D.Ill.1998) ("Similarity of legal theory is more important than factual similarity, so the presence of factual differences between the claims of the members of the proposed class is not fatal to a finding of typicality."). In that sense, plaintiffs' claims are typical; Sugar Creek's alleged practice of

refusing to provide Hispanics adequate medical attention applied to every Hispanic employee while only those who had an injury felt the brunt of the alleged practice. *See Walters v. Reno,* 145 F.3d 1032, 1047 (9th Cir.1998) ("Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate.").

Defendant is correct that nine of the ten named plaintiffs worked at Sugar Creek for a short time frame relative to the class period. The focus, however, is whether the interests of the plaintiffs are aligned with the class. It is plaintiffs' position in this suit that Sugar Creek's discriminatory practices continue to the present. Thus, those nine plaintiffs suffered the same types of legal injuries—discrimination in the terms and conditions of employment, hostile work environment, and failure to promote—that the Hispanic employees who followed them allegedly suffered. *See Mick,* 203 F.R.D. at 329 ("Although the damage to members of the plaintiff class certainly differs in degree, the fact remains that the proposed representatives' claims are typical of the class because the harm suffered is of the same type.").

It is somewhat difficult to assess defendant's fourth argument because the plaintiffs often could not remember the names of supervisors or could remember only first names. Nonetheless, the plaintiffs have sufficiently demonstrated typicality. Plaintiffs contend that a majority of Hispanic employees work the second shift. Steve Smithson is the manager of the second shift, and plaintiffs claim he enforced Sugar Creek's discriminatory practices. Thus, the alleged discrimination is claimed to be sufficiently widespread to satisfy the typicality requirement.

### 4. Adequacy of Representation

■ Rule 23(a)(4) allows certification if "the representative parties will fairly and adequately protect the interests of the class." This requirement is essential to due process because a final judgment in a class action is binding on all class members. *See American Medical,* 75 F.3d at 1083 (citing *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940)). In *Senter,* the Sixth Circuit articulated two criteria for determining

the adequacy of representation: (1) "the representative must have common interests with unnamed members of the class" and (2) "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." 532 F.2d at 525. "An individual may not be an adequate representative if she is subject to unique defenses that place her in a position that is antagonistic to the interests of the class." *Reeb,* 203 F.R.D. at 322 (citing *Levels v. Akzo Nobel Salt, Inc.,* 178 F.R.D. 171, 179 (N.D.Ohio 1998)).

■ Defendant first argues that plaintiffs are not adequate class representatives because their "honesty and credibility is seriously in question." Defendant points to inconsistencies in the testimony of plaintiffs and maintains that plaintiff Cervantes has a criminal record. Secondly, defendant argues that the claims of named plaintiffs are subject to unique defenses because not every class member suffered workplace injuries or was disciplined.

The Court finds that the adequacy of representation requirement is satisfied. Upon review of plaintiffs' depositions and factual allegations, the Court finds no credibility problems so serious as to compel a finding that the interests of the plaintiffs and the class are antagonistic. Defendant may be correct that plaintiffs' testimony is not foolproof, but this goes to the merits of the class claims and not to the adequacy of plaintiffs as representatives. *Compare Cross v. Dickstein Partners, Inc.,* 172 F.R.D. 108, 113 (S.D.N.Y.1997) (finding no "clear, critical inconsistency sufficient to make [plaintiff] an inadequate class representative") *with Kline v. Wolf,* 702 F.2d 400, 403 (2d Cir.1983) (upholding the district court's finding that plaintiffs were not adequate class representatives because of admitted false statements which left their credibility "vulnerable to serious attacks"). The Court notes that each plaintiff has demonstrated his or her willingness to prosecute this suit. Although some of the plaintiffs live out of state, each plaintiff submitted to a deposition and has supported this litigation. Finally, although the factual situation of each plaintiff may vary slightly, defendant has not demonstrated that plaintiffs'

claims are subject to unique defenses that place them in a position antagonistic to the interests of the class.

### B. Requirements of Rule 23(b)

In addition to meeting the requirements of Rule 23(a), a proposed class must also satisfy at least one of the criteria set forth in Rule 23(b). In the present case, plaintiffs move for class certification pursuant to Rule 23(b)(2), or, in the alternative, Rule 23(b)(3). Rule 23(b)(2) provides that certification of a class is appropriate when:

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Fed.R.Civ.P. 23(b)(2). This rule seeks to correct situations where the defendant's conduct or refusal to act is affecting all class members and the conduct is susceptible to correction through the court's equitable powers.

■ Certification under Rule 23(b)(2) is appropriate when a party opposing the class has acted in a consistent manner towards the purported class members such that defendant's actions are part of a pattern or practice of activity, *see Bermudez v. United States Dep't of Agric.,* 490 F.2d 718 (D.C.Cir. 1972); *Crippen v. Dempsey,* 549 F.Supp. 643 (W.D.Mich.1982), or when a defendant has established a regulatory scheme common to all class members. *See White v. Beal,* 413 F.Supp. 1141 (E.D.Pa.1976); Wright, Miller & Kane, 7A Fed. Prac. & Proc. § 1775. Rule 23(b)(2) is applicable when the court's equitable power is the primary form of relief sought, not when the appropriate final relief relates exclusively or predominantly to money damages. Fed.R.Civ.P. 23(b)(2) advisory committee notes to 1966 amendments; *see Doninger v. Pacific Northwest Bell, Inc.,* 564 F.2d 1304, 1314 (9th Cir.1977).

■ Defendant argues that certification under Rule 23(b)(2) is inappropriate because plaintiffs primarily seek monetary relief. Defendant relies heavily on *Allison v. Citgo*

*Petroleum Corp.,* 151 F.3d 402 (5th Cir.1998), in which the Fifth Circuit held:

> [M]onetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief.... By incidental, we mean damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief.... Ideally, incidental damages should be only those to which class members automatically would be entitled once liability to the class (or subclass) as a whole is established.... Liability for incidental damages should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations.

*Allison,* 151 F.3d at 415 (citations omitted).

Defendant contends that the compensatory and punitive damages requested by plaintiffs predominate over any form of injunctive or declaratory relief sought. Defendant cites plaintiffs' response to defendant's Interrogatory No. 7, which asked plaintiffs to state the damages they are seeking. Plaintiffs responded that they seek damages for: the differential between the wages promised and the wages actually received; the value of promotional opportunities denied; the value of benefits not received; pain and suffering; and punitive damages. These potential monetary damages are not incidental or *de minimus,* argues defendant, because Title VII permits recovery up to $300,000 and § 1981 has no dollar limit. *See Bacon v. Honda of America Mfg., Inc.,* 205 F.R.D. 466, 476 (S.D.Ohio 2001). Nine of the ten named plaintiffs are no longer employees at Sugar Creek; thus, defendant argues, no injunctive relief is available to them.

Plaintiffs respond that their primary goal in this action is to "effect a change in the way Sugar Creek treats Hispanics" through equitable relief. Plaintiffs argue that the demand for compensatory damages is incidental to the changes in Sugar Creek's practices and policies which they seek. Plaintiffs liken this case to *Reeb v. Ohio Dept. of Rehabilitation,* 203 F.R.D. 315 (S.D.Ohio 2001), where

the court certified a class of female employees at a correctional institution. Although plaintiffs sought $5 million in damages under Title VII and § 1981, the court found that plaintiffs' demand for equitable relief "clearly predominate[d]." 203 F.R.D. at 324.

> The [Civil Rights Act of 1991, 42 U.S.C. § 1981a], which made compensatory and punitive damages available to plaintiffs claiming intentional discrimination under Title VII, was intended to broaden the relief available to such plaintiffs, not curtail their ability to bring such claims through the vehicle of class actions.... In broadening Title VII plaintiffs' options for relief, Congress did not intend to force plaintiffs to choose between broad relief and the advantageous vehicle by which that relief could be sought. More likely, in drafting the 1991 Act, Congress did not anticipate the conflict that was created with Rule 23(b)(2).... This Court cannot and will not now read the Rules of Civil Procedure as eviscerating the substantive rights granted by Congress.... Neither the Rule nor the accompanying Advisory Committee Note requires that damages be incidental to the equitable relief sought in order for a class to be certified under 23(b)(2). *See* Fed.R.Civ.P. 23(b)(2) advisory committee's note (stating that 23(b)(2) should not be utilized for cases in which the final relief relates "exclusively or predominantly" to money damages).

*Id.* at 323 (citations omitted).

This Court finds *Reeb* persuasive. That Congress made monetary relief available to Title VII plaintiffs should not be used to defeat an otherwise proper class action. *See Hoffman v. Honda of America Mfg., Inc.,* 191 F.R.D. 530, 536–37 (S.D.Ohio 1999) (rejecting *Allison's* bright-line test that class certification is improper where compensatory and punitive damages are not incidental to equitable relief). The amended complaint specifically demands the following declaratory and injunctive relief: reinstating their job positions; requiring Sugar Creek supervisors and managers to undergo cultural sensitivity and related training; establishing a program for registering and investigating complaints of racial discrimination; instituting a pro-

gram that would provide Hispanics equal employment opportunities at Sugar Creek; and requiring Sugar Creek to truthfully represent wages, benefits, and opportunities to prospective employees.

The Sixth Circuit's recent decision in *Coleman v. General Motors Acceptance Corp.*, 296 F.3d 443 (6th Cir.2002), is not to the contrary. In *Coleman*, plaintiff alleged that GMAC discriminatorily marked-up the interest rates charged to African American purchasers. Plaintiff brought suit alleging racial discrimination under the Equal Credit Opportunity Act and sought certification under Rule 23(b)(2). The district court certified a plaintiff class of all African American consumers who obtained financing from GMAC in Tennessee under the financing plan extended to the named plaintiff.

The Sixth Circuit reversed, citing *Allison* with approval for the proposition that certification under Rule 23(b)(2) is proper only where injunctive relief predominates. "[I]n determining whether injunctive relief predominates in a Rule 23(b)(2) class, one critical factor is whether the compensatory relief requested requires individualized damages determination or is susceptible to calculation on a classwide basis." 296 F.3d at 448. Plaintiff sought compensatory damages for the difference in the markup imposed on her and the average markup imposed on Caucasians. The court found that such damages were not susceptible to calculation on a classwide basis because the "request for compensatory damages defines them by reference to the markup charged to each individual member of the class." *Id.* at 449.

Here, the request for injunctive and declaratory relief predominates. The plaintiffs seek injunctive relief as to the allegedly discriminatory manner in which Sugar Creek treats Hispanic recruits and employees. In *Coleman*, the court specifically noted that "back pay is qualitatively different from compensatory damages ... because calculation of back pay generally involves less complicated factual determinations and fewer individualized issues." *Id.* at 449. Further, plaintiffs' demand for compensatory damages is susceptible to calculation on a classwide basis. Plaintiffs allege that Hispanics were universally denied a certain slate of economic goods incident to employment at Sugar Creek—a fair salary, employment benefits, and housing at a fair market value. These damages can be calculated by reference to Sugar Creek's wage tables, as well as by economic valuations of the benefits denied Hispanics and the fair market value of the housing provided them. Plaintiffs also have defined their demand for pain and suffering in terms of the class—the amended complaint states that Hispanics experienced emotional distress stemming from Sugar Creek's English-only rule. Whether such a theory can prevail remains to be seen, but it is stated in classwide terms.

Defendant are correct that nine of the ten named plaintiffs are former employees. Yet this does not preclude certification under Rule 23(b)(2) because these former employees seek equitable relief in the form of reinstatement and back pay. If reinstated, these plaintiffs will benefit from the injunctive relief sought concerning how Sugar Creek treats Hispanic employees. The Court notes the possible tension between reinstatement and the interests of current employees in keeping their jobs. At this stage in the litigation, it is unclear what percentage of the class is comprised of former employees. If it later becomes apparent that there is a division in the interests of the class members or that the named plaintiffs cannot adequately represent the class, the Court will revisit this issue.

Because the Court finds that Rule 23(b)(2) is satisfied, it declines to address plaintiffs' alternative argument that the action should be bifurcated and certified under Rule 23(b)(3).

## V. Conclusion

For the reasons stated above, the Court GRANTS plaintiffs' August 31, 2001 Motion for Class Certification under Rule 23(b)(2).